

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-75,804-02

**EX PARTE HANNAH RUTH OVERTON, Applicant**

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE N0. 06-CR-3624-F IN THE 214TH DISTRICT COURT
### FROM NUECES COUNTY

COCHRAN, J., filed a concurring opinion in which JOHNSON and ALCALA, JJ., joined.

### CONCURRING O P I N I O N

I join the majority opinion. I write separately to explain how the proceedings in this case were problematic from the beginning.

We know that four-year-old A.B. died of salt poisoning. But the question at the capital murder trial was whether (1) applicant forced A.B. to eat that salt and/or delayed taking him to a hospital until she knew that it was too late to save his life, or (2) unbeknownst

to applicant, A.B. had an eating disorder that made him binge on salt, and he became so ill that no medical care could save him. The jury found that applicant did not feed A.B. salt, but that she knowingly caused his death by failing to take him to the hospital in time to save his life.[1] Because the jurors were not instructed on lesser-included offenses, they convicted applicant of capital murder and sentenced her to life in prison without the possibility of parole. In this writ proceeding, applicant makes numerous constitutional claims, including "actual innocence," *Brady*, and ineffective assistance of counsel. As the majority concludes, she is entitled to relief and a new trial.

---

[1] The application paragraph of the jury charge read as follows:

Now if you find from the evidence beyond a reasonable doubt that HANNAH RUTH OVERTON, defendant, on or about the 2nd day of October, 2006, in Nueces County, Texas, did then and there intentionally or knowingly cause the death of an individual younger than six years of age, namely [A.B.], by causing [A.B.] to ingest a substance containing acute toxic levels of sodium, and/or intentionally or knowingly cause the death of [A.B.] by omission, failing to provide or to seek medical care or treatment for [A.B.] and the defendant had a statutory or legal duty to act or the defendant had assumed care, custody or control of [A.B.]; then you will find the defendant, HANNAH RUTH OVERTON, guilty of Capital Murder as charged in the indictment.

After returning its verdict, the jury was officially polled as to which theory it had based its verdict. Every juror said that he had found that applicant intentionally or knowingly failed to provide or seek medical care for A.B.

One might question whether capital murder under Section 19.03(a)(8) includes a "murder" under 19.02(b)(1) caused by the defendant's omission. *See* Section 6.01(c). The present indictment and jury charge appears to be a pastiche of the elements of injury to a child under Section 22.04(a), which does include criminal liability for omissions as well as affirmative acts, and capital murder. Although applicant complained about this aspect of the jury charge in the trial court, she did not raise this particular issue on appeal. *Overton v. State*, No. 13-07-00735-CR, 2009 WL 3489844, at *30 n.90 (Tex. App.–Corpus Christi Oct. 29, 2009, pet. ref'd) (not designated for publication). That issue is not presently before us.

**A.**    ***Brady* Issues**

The majority does not address applicant's *Brady*[2] claims because it grants relief based on one of her ineffective assistance of counsel claims.  It is helpful, however, to place that ineffective-assistance claim within the broader context of applicant's claims concerning the fundamental unfairness of her trial.  Without that broader context, it might appear that the failure to call Dr. Moritz as an expert concerning salt poisoning did not necessarily infect the entire trial and lead to a reasonable probability that the result of this trial would have been different but for trial counsels' deficient performance in that regard.[3]

First, applicant raises *Brady* claims concerning discovery disputes with the lead prosecutor.  One *Brady* issue concerns the alleged withholding of records showing the low sodium content of A.B.'s vomit when he was brought to the Urgent Care Center.  The second *Brady* issue concerns the purported failure to disclose Dr. Cortes's medical records and knowledge that A.B. suffered from undiagnosed cognitive deficiencies that caused him to have temper tantrums, throw feces, and eat inappropriate items, such as salt.

*1.     The Vomit Exhibit and Mislabeled Experiment.*

At the habeas hearing, the lead prosecutor conceded that, during this 2007 trial, she was an alcoholic[4] who was also taking prescription diet pills that affected her memory.  She

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

[3] *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

[4] She testified that she is now in recovery and that her "sobriety date is January 20th of 2011."

was later fired by the District Attorney (who had been the second-chair prosecutor during this trial) for unrelated ethical violations.  During the habeas hearing, the prosecutor repeated seventy-two times that she did not recall or did not know the answers to questions concerning the investigation or trial of applicant.  She could not remember documents that she had written during the trial and did not recognize her handwriting; she did not remember writing the e-mails that came from her e-mail address, nor receiving other e-mails at that address; she could not remember if she saw any vomit when she previewed the evidence with one of applicant's counsel before trial, and she did not remember asking the police to have it tested.

The second-chair prosecutor (later appointed as the District Attorney by the Governor) testified that the lead prosecutor told her that "she would do anything it would take to get an advantage over the Defense," including sending a "spy" to applicant's church group to learn the defense strategy.  The second-chair prosecutor testified that the lead prosecutor was not ethical and was "not truthful."  She said that the lead prosecutor told her that no vomit samples had been saved as evidence.  She said that she was "concerned with the fact that [the lead prosecutor] was violating the Court's orders."

When confronted with various court documents and exhibits that purportedly contained her signature and initials and referred to A.B.'s vomit that was recovered at the Urgent Care Center, the lead prosecutor could not "remember," "recall," or "identify" anything, even though she had explicitly requested that this vomit be tested.  When shown a picture of the Bemis cannister containing the vomit, the prosecutor said, "No. I do not

remember specifically seeing it.  That doesn't mean I didn't see it. I just don't remember."

When asked about the experiment that the medical examiner conducted with this vomit at her request, the lead prosecutor could only "vaguely" recall it, but nothing refreshed her recollection of what the results of that experiment were.

This cannister containing the vomit was, according to applicant, crucial to her defense in showing that A.B. had himself binged on salt earlier in the day because that vomit contained just exactly what applicant said it would–a little Zatarain's creole seasoning and a little chili.  The fatal salt ingestion had, according to the defense, occurred earlier when applicant was resting and A.B. got into the kitchen cupboard and helped himself.

Applicant's *Brady* claim was that the prosecution never told her about this specific vomit exhibit, where it had been recovered, or that the prosecutor had had its contents tested.[5]

---

[5] The prosecution had turned over some information about the vomit to the defense, but it was labeled as "gastric contents" collected "from Hospital" which implied that the material was collected from inside A.B.'s stomach at the Spohn Hospital.  The defense knew that vomit had been suctioned from A.B.'s mouth when he first arrived at the Urgent Care Center, but they were repeatedly told that no such vomit had been preserved.  Furthermore, when Dr. Fernandez conducted an experiment with both the vomit and a solution of Zatarain's and water, the labels for each item were reversed so it looked like specimen D– the "Hospital gastric contents"–was really Specimen E–the Zatarain's and water slurry.  Dr. Fernandez's report shows that the "Hospital gastric contents" (the vomit recovered from A.B.'s mouth at the Urgent Care Center) had a low sodium content of 48 while the Zatarain's mixture had a high sodium content of 250 (about the same sodium level that was in A.B.'s blood system at the Spohn Hospital).  The State did not inform the defense of this mislabeling error or of the actual source of the "gastric contents."

Dr. Melinek, the defense expert at trial, testified at the writ hearing.  She said that, before trial, she had asked one of the defense attorneys why the hospital gastric exhibit had such a low level of sodium if A.B. had consumed a great deal of salt.  The attorney told her that "[i]t probably came from the hospital and it may have happened after gastric lavage, which is washing out of the stomach."  The defense was misleading its own expert witness based upon those attorneys having been misled by the mislabeled experiment and the mistitled vomit exhibit.  Dr. Melinek, based on the inaccurate information, therefore discounted the importance of the exhibit in forming her opinion

The discovery material showed that the results of the medical examiner's experiment on the vomit were not mailed to the defense, but the lead prosecutor could not recall anything about that, even though her handwritten notes were on the test results.

The significance of the vomit sample is that it had a low sodium level of 48 milliequivalents while A.B.'s blood sodium level, first measured at the Spohn Hospital about an hour later, was at a lethal level of 242.[6]  The defense theory is that this vomit proves that the little bit of chili and Zatarain's that applicant fed A.B. right before he started to fall ill had nothing to do with his death.[7]   A.B., on the verge of death, would have vomited up anything that he had eaten after the earlier fatal salt ingestion.   It was the discrepancy

---

at trial.  She now believes that this exhibit was "crucial" and would have changed her trial testimony.

[6] Dr. Michael Moritz, as the majority notes, is a leading expert on hypernatremia or salt poisoning.  He testified during the writ hearing that a person experiences "severe hypernatremia" at the level of 170 milliequivalents and above.  I refer to Dr. Moritz's writ hearing testimony not to prove certain facts or issues but to show how critical his testimony was to the defensive theory.

[7] The State's expert testified that it would require 23 teaspoons of Zatarain's creole seasoning to raise A.B.'s blood sodium level to 245 milliequivalents.  According to the Zatarain's company, a serving size is 1/4 teaspoon, so A.B. would have had to ingest close to 100 servings of Zatarain's. http://www.mccormick.com/Zatarains/Products/Spices-and-Seasonings/Spices-and-Extracts/Creole-Seasoning.
However, as Dr. Moritz explained at the writ hearing, some children have a rare condition that shuts off the mechanism that makes one who eats a salty food become very thirsty. He said,
> There is a variety of neurological conditions or structural abnormalities of the brain,
> in particular related to the hypothalamus, different brain tumors or whatnot, where
> the children do not sense thirst normally or these mechanisms that keep the sodium,
> in a normal range don't kick in or shut off unless they're well outside of that normal
> range.
It was, therefore, possible that A.B. had a condition that made his baseline sodium level unusually high, and it would not take so much salt to get to 245.  However, the medical examiner did not preserve any part of A.B.'s hypothalamus, so it is now impossible to test that theory.

between the small amount of salt in A.B.'s vomit (recently ingested) and the fatal amount of salt in A.B.'s blood (ingested earlier in the day or over several days or weeks and absorbed from the stomach and intestines into the blood stream) that was significant.

Applicant had testified at trial that she (six months pregnant and recovering from whiplash injuries), her two-year-old son, and A.B. rested together in bed that morning and watched cartoons. She fell asleep and, when she woke up, A.B. was no longer in the room. She found him standing on a stool in the kitchen pantry, having knocked something down from the shelf.[8] It was a couple of hours after this pantry incident that A.B. began throwing a tantrum, defecated and smeared feces everywhere, was thirsty, and wanted more salt.[9]

2.    *A.B.'s Pre-Existing Developmental Problems.*

At the motion for new trial hearing, based on a *Brady* claim concerning whether the State failed to disclose exculpatory evidence, Dr. Cortes, A.B.'s regular pediatrician, testified that he had told the prosecutors that he did not think that applicant intended to kill A.B. But the lead prosecutor testified and denied that he had told her this. Dr. Cortes explained,

---

[8] Photographs of the pantry show a Morton salt container on a shelf near the stool A.B. was standing on, as well as candy that had been moved around.

[9] At the writ hearing, Dr. Moritz stated that this was "a perfect storm." He meant that A.B. [w]ould have voluntarily ingested a solution that had . . . a lethal dose of sodium, that it would have been palatable to the point for him that he could have ingested it without vomiting, that it was at a concentration not so high that it would induce a severe gag reflex, that it was a liquid that could be rapidly absorbed, that his behavior prior to that was unusual enough that a well-intentioned caretaker wouldn't necessarily immediately notice what happened, and there were periods where he was unobserved because Hannah is watching other children, she's pregnant, she has an injury, she's taking oxycodone, there's other people coming to the door.

I've been very consistent in that from the very beginning that I didn't think it was [applicant's] intent to kill him or harm him, that I think that this was a case of her trying to discipline a frustrating child to parent and that the discipline went wrong.

The lead prosecutor said that Dr. Cortes never said any such thing. "In fact, he kept mentioning situations in the ER room, how parents even come when a child has a fever, that there was no excuse for her doing this." A member of the prosecution team, Adolfo Aguilo, and the lead prosecutor both testified that they felt like Dr. Cortes was a "member of the prosecution team," not simply a neutral medical witness.

On direct appeal, the court of appeals rejected this *Brady* claim because "there is conflicting evidence regarding whether the State knew of the alleged exculpatory evidence[.]"[10] And the evidence was conflicting on that particular issue. Just as the evidence

---

[10] *Overton v. State*, No. 13-07-00735-CR, 2009 WL 3489844, at \*32 (Tex. App.–Corpus Christi Oct. 29, 2009, pet. ref'd) (not designated for publication). The court also concluded that, even if the prosecutor failed to turn over exculpatory evidence, it would not have made any difference to the outcome because "Dr. Cortes did not testify at the motion for new trial hearing that he believed that Overton did not commit the offense knowingly." *Id.* at 33. It explained that the State asked, "Doctor, it's not your testimony that Ms. Overton wouldn't have understood the seriousness of her child's condition at the time, is it, at the time he was suffering from salt intoxication?" Dr. Cortes replied, "Well, you have to remember that when something like this occurs, you go from being in a normal state to gradually going into a coma. So, I would imagine that at some point she should have known that he was having difficulties and that she should call 911." *Id.* The court held that this testimony sufficed to show that applicant knowingly caused A.B.'s death by omission, but evidence that, at some point, applicant should have called 911 because A.B. was having "difficulties" and eventually slipped into a coma, does not prove that she knew, before starting for the Urgent Care Center, that he would die if she did not call 911.

The court of appeals's discussion of this point is illuminating because it shows the critical importance of Dr. Moritz's testimony to the defensive theory. According to Dr. Moritz, an LVN such as applicant would not have received any training on hypernatremia, its causes, effects, or symptoms when she was certified more than ten years earlier. Dr. Moritz stated that hypernatremia cases are "notoriously difficult diagnoses" for doctors, and it would not be fair to expect a lay person to diagnose it. In fact, from what Dr. Moritz had read about this case, "every step along the way

was conflicting on the issue of whether the lead prosecutor failed to disclose the vomit evidence obtained from the Urgent Care Center.  The lead prosecutor's testimony conflicted with that of several different witnesses.

Part of applicant's current *Brady* claim centers on a different aspect of Dr. Cortes's potential testimony: it is that the State intentionally hid Dr. Cortes's medical records that showed that A.B. had been diagnosed with developmental problems.  The second-chair prosecutor testified at the writ hearing that Dr. Cortes had been moved from room to room during the trial and was becoming frustrated about when he was going to testify.  When the second-chair told the lead prosecutor that Dr. Cortes wanted to know when he was going to testify, the lead prosecutor told her that "she did not want to call him . . . [b]ecause she was concerned that he would testify that [A.B.] had behavioral problems."

Dr. Cortes explained at the writ hearing that he had showed the prosecutor his medical records "and the fact that I was concerned about some of his speech and cognitive function and referred him for hearing tests and for an evaluation with a child neurologist."[11]

---

[applicant] provided reasonable care."   He also stated that calling 911, waiting for the ambulance to come, taking the 15 minute drive to the hospital, taking the time to do the necessary sodium value testing (two tests because the first sodium test would register above the reference range and a "stat" dilution test would have to be performed, but typically the turn-around for such a "stat" test is within one hour),would have taken more than a hour, but it was "exceedingly unlikely" that a child with 245 milliequivalents in the blood could survive for more than an hour.  Dr. Moritz concluded that there was "no delay" by applicant "that caused any harm" to A.B.  He would have died no matter how quickly she reacted to his lethargic state.

[11] Three days after the trial, Dr. Cortes called the lead defense attorney because he felt he had been "tricked" by the State.  "I felt like the Prosecution had its own theory about what happened." Dr. Cortes knew that Dr. Rotta's testimony "championed" the State's theory while he, Dr. Cortes, felt that A.B. had "other kinds of neurological problems."  Dr. Cortes "wanted the whole truth to

According to the defense, this medical history was crucial because the State had insisted throughout the trial that A.B. was a perfectly normal four-year-old who had no prior medical problems.[12]

Based on symptoms that Sharon Hamil, A.B.'s foster mother relayed to Dr. Cortes, A.B. was referred to a neurologist, Dr. Gary Bobele, at the Driscoll Children's Hospital. Ms. Hamil, A.B.'s foster mother, reported to Dr. Bobele that A.B. "[h]ad exhibited echolalia during the time that she had him. This is a condition in which the child repeats the last word or two of an instruction that's given to him." That symptom is important because it "is seen with children who have other kinds of neurological problems, like mental retardation or autism spectrum disorder." Dr. Cortes explained that children who are intellectually delayed first experience difficulties in speech and communication, but they also have "a shorter fuse and get angrier more quickly. They throw temper tantrums. . . . They can also exhibit bizarre behaviors like smearing feces on things, the wall, or eating things that are inappropriate."

have been presented to the jury." After the trial Dr. Cortes discovered that the prosecutor had told the judge during the trial that she was not going to call him, so when she attempted to call Dr. Cortes in rebuttal, the judge would not allow it.

[12] At trial, A.B.'s foster mother, Sharon Hamil, testified that A.B. had no behaviorial or developmental problems and that he was a "normal" four-year-old. Dr. Cortes's medical records show, however, that Ms. Hamil brought A.B. to him because "he didn't talk or act like other children his own age and that he was a very late talker. And when he did talk, sometimes she couldn't understand him." A.B.'s school records also showed that Ms. Hamil expressed concerns to his teachers at special education meetings about his abnormal behavior. Indeed, as early as November 2004, two years before A.B.'s death, Ms. Hamil was aware that he suffered from a "solid" developmental delay of eight months in both language and cognitive skills.

A.B. already had eating issues when he was under Ms. Hamil's care. She stated that "[A.B.] liked to eat every day, all day, any time." He once ate five large slices of pizza; he ate chicken and dumpling soup until he threw up. He ate and ate and ate.

Those were the same behaviors that applicant and her husband had seen in A.B. and which support applicant's trial theory that A.B. died from self-induced salt poisoning.[13]  But she, unlike Sharon Hamil, had never been told of A.B.'s malady.  Sharon Hamil testified that A.B. had no medical problems, but his medical records, which the prosecutor had in her possession, showed that he had been assessed for a neurological disability.

Since the trial, Dr. Cortes had reviewed applicant's trial testimony and modified his opinion even more.

> Up until now everybody has been of the opinion that [A.B.] was given a large dose of sodium.  And to be honest with you, as I've reviewed his behaviors and also the fact that he had Zatarain's the night before, he had stew with Zatarain's again on the morning of his death, and then he had a cup of those spices when he insisted on eating more, I believe that this child's sodium intoxication was either subacute or chronic.[14]

Dr. Cortes now believes that A.B. could have picked up a salt shaker and eaten its contents because he was a chronic salt consumer.  Based on the evidence at trial, Dr. Cortes now thinks it's possible that A.B. had an undiagnosed intellectual disability, and that his eating disorder and temper tantrums could be traced to that problem, a medical disability of which

---

[13] During the writ hearing, Dr. Moritz read from one of his recent articles on hypernatremia that many severe hypernatremia cases have resulted from voluntary sodium ingestion, but they "may have been misclassified in the literature as child abuse when they likely were not.  Fatal voluntary salt poisoning is well described in adults, but primarily in patients with psychiatric or developmental conditions."  Dr. Moritz's article stated that, out of his case studies of about twenty children, "[t]here is only one documented report of forced salt poisoning to an older child in the literature, a five-year-old.  All other reports are in infants."

[14] Dr. Cortes distinguished an acute intoxication as "where you took a large amount of a poison," whereas a chronic exposure is a lesser amount over a longer period of time, "then you reach a point where even a small amount of that material can throw you into an acute intoxication and you become symptomatic."

applicant was wholly unaware.[15]

Dr. Cortes agreed that he would not have called 911 at the first symptoms that A.B. experienced, vomiting. Nor would he have called 911 when a child says that he has chills; he, like applicant, would check his vitals and try to warm him up. He would not necessarily call 911 when a child started to have congested breathing as A.B. did, because the nebulizer treatment temporarily cleared it up. Dr. Cortes agreed that when A.B. "became more lethargic and less communicative with the parents, [he] would expect her then to make haste and take him to a medical facility." According to the defense theory, that is precisely what applicant did. But it was already too late.

The symptoms of hypernatremia (salt poisoning) are vomiting, chills, and irregular breathing, leading to lethargy, cessation of breathing and heart failure. Up until the child

_____

[15] Although she was unaware of A.B.'s medical problem, she did tell the CPS worker assigned to A.B.'s adoption during a home visit the week before A.B.'s death that A.B.'s "behavior had been more difficult since the accident," and that A.B. "had started picking up things from the floor and the trash and he was trying to eat those [things]." The CPS worker, trained to spot problematic behavior, told applicant of a condition called "pica" that includes the symptom of eating from the trash and, if A.B.'s strange behavior continued, applicant should "seek advice from a pediatric or other professionals."

A.B.'s tantrums and strange eating behavior had increased after a car accident the family had been in two weeks earlier. Applicant's husband accidentally ran a stop sign and another car hit them. Applicant was thrown against the windshield and cut her forehead badly. She had blood streaming down her face which terrified all of the children, especially A.B. Applicant suffered whiplash, her face was cut and bruised, four front teeth were loose, and her lip was "busted." She spent most of the next two weeks in bed or going to a chiropractor.

According to one scientific case study on fatal salt poisoning that Dr. Moritz referred to, "mental or emotional disorders are crucial for voluntary ingestion of toxic amounts of salt. We suggest that this phenomenon be called 'psychogenic salt intake.' . . . We call for increased awareness by practising doctors of this rare, yet widely available, form of intoxication." Y. Ofran, et al., *Fatal voluntary salt intake resulting in the highest ever documented sodium plasma level in adults (255 mmol L-1)*, 256 J. INTERNAL MED. 525, 527 (2004).

becomes lethargic, the symptoms are not alarming and indicate only a mild condition.  Dr. Cortes, who, unlike applicant, is familiar with hypernatremia, testified that once the child becomes lethargic and less communicative, "brain injury, neuronal injury, has occurred; and I think the likelihood of being able to save somebody at that point is very small." Hypernatremia is so rare that the hospital doctors did not recognize that A.B. had high salt levels for several hours.  During that time, they gave him three rounds of sodium bicarbonate and well as intravenous saline solution.[16]

3.      *The Significance of the Vomitus and of Dr. Cortes's Medical Records to the Defense Theory of A.B.'s Cause of Death.*

Dr. Melinek, the defense expert at trial, testified at the writ hearing that once she knew that A.B.'s vomit at the Urgent Care Center was so low in sodium, she could now say that it was "crucial" to find out what other substances were in the vomit.  That analysis would help determine whether A.B. ate straight sodium or whether he ate another substance that contained sodium shortly before he vomited.  Based upon all of the information that she had learned both before and after the trial, Dr. Melinek was now of the opinion that A.B. had a pre-existing "baseline neurologic dysfunction . . . in terms of abnormal behaviors, eating inappropriate things, going through the garbage, being found in the pantry on the day that his sodium went sky high."  She knew that applicant gave A.B. "some baseline sodium in the form of the chili and the Zatarain's" that was consistent with the vomit exhibit.  "But he

---

[16] That treatment did not contribute to his death; A.B. was effectively brain dead by the time he experienced an incident of cardiac arrest in the car on the way to the Urgent Care Center.

probably at some point ingested a load of salt on his own, either through getting into the pantry or dumping it into his own chili when Mrs. Overton was not paying attention because she was paying attention maybe to another child."[17]

Dr. Melinek also explained that salt poisoning will lead to coagulopathy or blood clotting that makes small scars, insect bites, and scratches appear gorged with blood and more pronounced.[18]   Sodium poisoning also affects the brain and makes it swell.   So by the time that A.B. suffered a cardiac arrest as applicant and her husband pulled into the Urgent Care Center, A.B. already had signs of impending death.   But, according to Dr. Melinek, this seizure "happened precipitously" and "there's no way it could have been predicted or expected."   A.B.'s gorging on salt several hours earlier was "a potentially fatal insult, and no amount of medical care is going to necessarily recover his functions."   Even immediate and massive hydration at a hospital will not help.

Dr. Melinek testified that, taking into consideration all of the newly discovered evidence, including the vomitus from the Urgent Care Center, A.B.'s full prior medical

---

[17] Indeed, she was in the bedroom with her two-year-old son while A.B., the four-year-old, was out in the kitchen pantry.

[18] Dr. Melinek testified that salt poisoning affects the blood system
on the osmolality but also on the clotting mechanisms of the body, cause a person to go into what's called DIC, or disseminated intravascular coagulation.   So what happens is the small blood vessels get clotted off.   And I saw that under the microscope when I testified the first time.   And it informed me to the fact that [A.B.] would therefore be more likely to bleed and it would enhance the appearance of a lot of the lesions on his body that were noted at the time of the autopsy.
Don't you wish medical experts learned to speak English?   A person with coagulopathy bleeds and bruises very easily.   The condition is similar to hemophilia.

records, and applicant's trial testimony, it was her opinion that A.B.'s death was an "accident."[19]   However, Dr. Melinek repeatedly said that, in making finer distinctions concerning death by salt poisoning, she would defer to Dr. Moritz, who had published numerous articles in the field of hypernatremia, so she would trust him and his opinion more than that of any critical-care pediatrician.

In sum, applicant contends that, if the prosecution had turned over (1) the correct information concerning the vomitus, its origin, and the time it was collected at the Urgent Care Center, and (2) Dr. Cortes's full medical records that showed that Ms. Hamil was wrong about A.B. being a normal, healthy four-year-old, then applicant would have called Dr. Cortes to testify on her behalf and Dr. Melinek would have been confident that A.B.'s death was a tragic accident that applicant could not have anticipated or prevented once A.B. climbed into the pantry by himself that morning.

The Court does not resolve applicant's *Brady* claims because it properly grants applicant relief on one of her ineffective assistance of counsel claims.  But those claims and the evidence that, she argues, supports them provide a broader context in which to assess the harm that the failure to call Dr. Moritz caused to the reliability of the verdict.

---

[19] Dr. Melinek explained that her opinion at trial was that A.B.'s cause of death was "undetermined" because she did not have enough information.  Now she did.

> At the time of trial and given that I didn't have all the additional information, this gastric information, the information about the full medical records, and also with regards to Hannah Overton, her own testimony–because I didn't get to hear other people's testimony; I only got to testify by what I reviewed up until that point–now reviewing everything, I think that this is an accident.

## B.      Applicant's Lawyers – Too Many Cooks in the Kitchen

Although applicant's five lawyers at trial were individually highly experienced and competent, they suffered from a serious failure to communicate competently with each other, with the doctors and experts, with the prosecution, and with applicant.

For example, one lawyer was in charge of all discovery, but he was not a criminal defense attorney and was unaware of criminal procedure or *Brady* disclosures. He was the one who saw a labeled brown bag at the police station, but did not open it. This was the bag that contained the crucial Beemis container of vomitus. If he had opened the brown bag and seen the Beemis container, he would surely have asked, "What's this?" And the prosecutor would have had to tell him precisely what it was and where it came from.

One lawyer attempted to visit with Dr. Cortes in the courtroom hallway, but was first told by the second-chair prosecutor that Dr. Cortes was "the prosecution's witness" and he couldn't talk to the doctor. Then she relented and said that he could talk to him for just a few minutes. Dr. Cortes thought he wasn't supposed to talk to the defense so he was guarded, and the lawyer quickly ended the conversation. Dr. Cortes, of course, is a medical doctor and A.B.'s treating pediatrician. He had a wealth of information about A.B.'s prior medical condition and would have shared it with the defense had he been reassured by both the prosecutor and the defense that he didn't "belong" to either party. He was a Dr. Friday, "Just the facts, ma'am," witness who could help the jury get to the truth of A.B.'s life and death.

Further, all of the defense counsel must shoulder some degree of responsibility for

failing to fully explain the law of lesser-included offenses to applicant. She apparently believed that, if the defense requested any lesser-included offenses, that was tantamount to pleading guilty to those lesser offenses and she would not be able to appeal if the jury found her guilty of one of them.[20]

This factual scenario is one in which *any* competent defense counsel should seek, along with intervening lesser-included offenses, an instruction on criminally negligent homicide for failing to recognize the seriousness of A.B.'s medical condition.

If a defendant "intelligently" chooses to limit her options to either a capital murder conviction with a sentence of life without parole or a "not guilty" (especially given the extensive adverse pretrial publicity in a "baby killing" case), and rejects the option of a two-year sentence for criminally negligent homicide, defense counsel has an obligation to both himself and his client to put that difficult-to-understand decision fully on the record.[21] Even

---

[20] To be fair to defense counsel, the law up until shortly before the trial was that a defendant who requested a lesser-included offense could not attack the sufficiency of the evidence of that lesser offense. In *McKinney v. State*, 207 S.W.3d 366, 374 (Tex. Crim. App. 2006), we explained that when a defendant requests an instruction on a lesser-included offense, he is not admitting that the evidence is sufficient to prove that lesser offense.

[21] Applicant's lead counsel, an attorney experienced in criminal law, testified that applicant was given incorrect advice by an attorney who was not a criminal defense lawyer. Lead counsel explained to her

> [t]hat if she were convicted of capital murder, she would get a life sentence without parole. She would be taking a chance doing that. If some of the jurors thought that she was not guilty of capital murder and some of them thought she was guilty, then there was a chance that they could compromise on a lesser offense. So I advised her I thought that there was evidence that supported lesser offenses, such as criminally negligent homicide.

Good advice. He should have delivered it more strongly–at least delivered it on the record in front of the trial judge and asked her if she really wanted to forego a potential compromise.

the lead prosecutor in this case agreed that the jury would probably have returned a conviction on a lesser-included offense in this case rather than a capital-murder conviction.[22]

Of course, as the majority explains, the failure to introduce Dr. Moritz's deposition or otherwise obtain his testimony was a glaring error, one that, by itself, establishes defective performance and harm to applicant under *Strickland v. Washington*.[23]  If it had not been so tragic, led to an unreliable verdict, and created such a waste of scarce judicial resources, this failure would smack of the Abbott and Costello skit, "Who's on First?"[24]

---

[22] The lead prosecutor's post-trial affidavit stated,
Based on my experience and considering the factors applicable to the Hannah Overton trial, particularly the jury's "omission poll," the jury in the Hannah Overton case in all likelihood would have returned a verdict on a lesser-included offense had the jurors been given that option.

[23] 466 U.S. 668 (1984).

[24] This baseball comedy routine was first made famous on the Kate Smith Radio Hour in 1938.  The skit begins with the following:

Abbott:       Strange as it may seem, they give ball players nowadays very peculiar names.

Costello:    Funny names?

Abbott:       Nicknames, nicknames. Now, on the St. Louis team we have Who's on first, What's on second, I Don't Know is on third--

Costello:    That's what I want to find out. I want you to tell me the names of the fellows on the St. Louis team.

Abbott:       I'm telling you. Who's on first, What's on second, I Don't Know is on third--

Costello:    You know the fellows' names?

Abbott:       Yes.

Costello:    Well, then who's playing first?

These are some of the problems with the attorneys' actions concerning the deposition:

- The deposition was conducted by one civil attorney while another watched and a third attorney watched a portion of it (no attorney of record participated in the deposition).

- None of the criminal-defense attorneys were aware of, or informed of, Dr. Moritz's opinion before trial, thus, they could not develop testimony from other witnesses to support that opinion.

- None of the criminal-defense attorneys viewed the videotape of the deposition, thus, they could not have intelligently decided whether the testimony was important enough to spend time splicing out the prosecutor's objections and inadmissible matters.

- The criminal-defense lawyer who was in charge of the medical aspects of the defense did not attend the deposition or ever view it during trial.[25]

- The lead defense counsel failed to look at the videotaped deposition. He relied on a co-counsel who told him the deposition was "not usable."[26]

---

Abbott:      Yes.

Costello:    I mean the fellow's name on first base.

Abbott:      Who.

From there it gets worse.

[25] At the writ hearing, this lawyer broke down in tears, admitting that he had been ineffective for failing to attend Dr. Moritz's deposition and failing to even view the videotape before the end of the trial. After watching the videotape shortly before the writ hearing, the lawyer realized that he had "failed miserably" by not presenting Dr. Moritz's testimony to the jury.

[26] Part of the reason that the co-counsel thought that the deposition was "unusable" was because the  lead prosecutor, during her cross-examination, suggested that applicant's children had said that she punished them for mouthing off by putting a piece of pizza pepper on their tongues. Such cross-examination would not be admissible as it is hearsay. The prosecutor would have to call the children to testify.  According to applicant, one of her former pastors had told her that this was a good way to instruct children that words and the use of one's tongue can cause harm to others. The truth of this matter is not before us, but admissible evidence of extraneous offenses may be offered under Rules 404(b) and 403 at a retrial.

There was no excuse for this. During the trial, the trial judge repeatedly asked defense counsel if they wanted to offer Dr. Moritz's videotaped deposition. The prosecutors said that they did not object to having the tape edited. During the writ hearing, the prosecutor forcefully cross-examined one of the defense attorneys on his failure to offer Dr. Moritz's edited deposition, perhaps unwittingly establishing applicant's ineffective-assistance claim.

In sum, I agree with the Court that Dr. Moritz's testimony was essential to applicant's defense. His opinion concerned the probability that A.B. could not have survived the ingestion of so much salt even if applicant had called 911 or raced him to the hospital at the first whisper of a symptom of illness.[27] If the jurors concluded that applicant knowingly caused A.B.'s death because she failed to seek medical care for him (as they said when polled), Dr. Moritz's testimony directly and fully rebuts that theory of criminal liability. Of course, a jury is not required to believe this testimony, but, if believed, Dr. Moritz's testimony exonerates applicant from criminal liability. Defense counsel was constitutionally ineffective for not permitting the jury to hear it and make its own assessment of credibility and scientific reliability. The present conviction "resulted from a breakdown in the adversary process that render[ed] the result unreliable."[28] Applicant is entitled to relief.

Filed: September 17, 2014
Publish

---

[27] The majority quotes that testimony on pages 11-13 of the opinion.

[28] *Strickland*, 466 U.S. at 687.