

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-84,324-01

### EX PARTE RICKEY DONNELL CUMMINGS

### ON APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS FROM CAUSE NO. 2011-1513-C1 IN THE 19TH DISTRICT COURT McCLENNAN COUNTY

*Per curiam.*

## O R D E R

This is an application for a writ of habeas corpus filed pursuant to the provisions of Texas Code of Criminal Procedure Article 11.071.

The record shows that the State indicted applicant for intentionally or knowingly causing the March 28, 2011 deaths of Tyus Sneed and Keenan Hubert by shooting them with a firearm during the same criminal transaction. *See* TEX. PENAL CODE § 19.03(a)(7)(A). The State's theory at applicant's November 2012 trial was that applicant and two co-defendants, Albert Love and applicant's younger brother, D'Arvis Cummings, committed the murders

in revenge against Keenan Hubert, whom they believed had killed their friend, Emuel Bowers III.

To support its theory, the State presented evidence that Bowers was shot to death in April 2010 near an East Waco park. Applicant, D'Arvis, and Love were among Bowers's close friends. Applicant and Bowers's family were intent on determining who killed Bowers, and they came to believe that Hubert was the culprit. As the first anniversary of Bowers's murder approached, they were frustrated that the police had not arrested anyone. And, in the period between Bowers's murder and the instant offense, applicant and Hubert had various tense encounters with each other.

On the evening of the instant offense, applicant and Hubert had another unfriendly encounter. Specifically, Hubert, Marion Bible, and Deontrae Majors were sitting in Majors's parked car at the Lakewood Villas, an East Waco apartment complex. They were smoking marijuana and socializing. Applicant walked by the car and "mean mugged" or glared at Hubert. Hubert responded by rapping some antagonizing song lyrics at applicant. After applicant walked away, Tyus Sneed joined Hubert, Bible, and Majors in the car, and the group continued to smoke and socialize.

After glaring at Hubert, applicant was in an agitated state. Around this time, applicant received a text from his girlfriend, asking if he was okay and if he was getting ready to fight someone. Applicant also threatened to "shoot up" a car that was arriving at the complex, because applicant believed the car had almost hit him. The car's passenger, Darnell "Bo"

Atkins, was arriving to visit his girlfriend. Bo knew applicant and talked to him. They then went to Bo's girlfriend's apartment, where they talked and smoked marijuana. Bo's teenage son, Miche'al Atkins, was present and overheard applicant say something about how applicant was going to shoot someone. Although Miche'al was in another room, Miche'al was able to hear applicant's statement because of the "above average" volume of applicant and Bo's conversation. After making the comment about shooting someone, applicant received a telephone call. Miche'al could not hear applicant's part of the conversation, but when the call ended, applicant left the apartment.

At about 11:20 p.m., roughly twenty minutes after applicant left Bo's girlfriend's apartment, assailants riddled Majors's car with gunfire, shooting out the back windows. Hubert and Sneed, who were sitting in the back seat, died at the scene from multiple gunshot wounds. Although they were both wounded, Bible and Majors escaped through the front passenger side door and fled to a nearby apartment that Bible shared with various people, including his girlfriend's aunt, Nickoll Henry. Henry was inside the apartment and went to the front door right after Bible and Majors burst in. Henry saw applicant standing about ten feet away, trying to unjam a semiautomatic pistol. Henry shut the door, locked it, and fled deeper inside the apartment until police and emergency medical personnel arrived.

The shell casings and projectiles recovered from around Majors's car indicated that Hubert and Sneed's assailants probably used an AK-47 or SKS assault rifle, as well as firearms capable of firing .38-, .40-, and .45-caliber ammunition. In addition, Henry's

apartment had bullet damage to the exterior wall and a bullet hole in the wall behind the living room couch. The bullet damage had not been there before the offense. There was also a .45-caliber cartridge on Henry's dining room floor. The cartridge had not been there before the offense.

Minutes after the shooting and less than half a mile away, police officers made a traffic stop of a car that was traveling away from the scene and which generally matched the description of a vehicle reportedly involved in the shooting. D'Arvis Cummings was the car's driver and sole occupant. During that stop, officers seized a .45-caliber pistol later shown to belong to applicant. A crime scene unit officer tested D'Arvis's hands for gunshot residue (GSR), obtaining a negative result, and photographed various items that were inside the car. These items included several cell phones, a white t-shirt on the back seat, and a bottle of hand sanitizer on the backseat's floorboard.

When investigators arrested applicant on April 1, they recovered a .40-caliber Ruger pistol from his vehicle, as well as .45-caliber and .38 Special ammunition, a red sweater, a red hoodie, and hand sanitizer. Applicant had a loaded .40-caliber magazine fitting the Ruger in his front pocket. Applicant's hands tested negative for gunshot residue. Ballistic comparisons did not match either of the seized pistols to the shell casings or projectiles recovered from the scene or the victims' bodies. However, the .45-caliber ammunition recovered from applicant's car was the same, albeit widely-available, brand as the cartridge collected from Henry's dining room.

Although the seized pistols were later ruled out as the murder weapons and neither applicant's nor D'Arvis's hands tested positive for gunshot residue, the evidence showed that, about forty minutes before the shooting, Robert Sneed (Tyus Sneed's father) saw and talked to applicant in one of the Lakewood Villas's breezeways. Applicant was wearing a black hoodie with the hood raised. Two unfamiliar men were standing at the end of the breezeway, although Robert did not know whether the men were with applicant.

Immediately before the shooting, another witness saw three black males[1] (one wearing a black top, one wearing a red top, and one wearing a white top) sneaking across the breezeway and around the corner of a building; the man wearing red carried a long gun attached to a shoulder strap. And Bible testified that, in a police interview about the shooting, he reported hearing a rumor that Love's girlfriend had bought Love an AK-47 rifle. Love had also previously shown Bible various handguns that Love owned, including a .38-caliber pistol and a .45-caliber pistol. In addition, on the afternoon of the offense, a witness saw a firearm consistent with an assault rifle lying on the backseat of applicant's car, although applicant was not in the car and the witness did not recognize the driver. The witness photographed her cousin posing in the car with the weapon; this photograph was admitted at trial and published to the jury.

Cell phone records showed that applicant had several communications with D'Arvis and Love shortly before the shooting occurred and that Love was in the vicinity of the

---

[1] The record shows that Applicant and his co-defendants are black.

Lakewood Villas at the time of those communications. Further, Brittany Snell was a friend of applicant's who lived at the Lakewood Villas. Snell testified that, shortly after the shooting, applicant came to her apartment with Love and asked to use her phone so he could call D'Arvis. Snell's cell phone records established that applicant made this call to D'Arvis's at 11:32 p.m., and thus that applicant and Love were present at the Lakewood apartments twelve minutes after the shooting. While in Snell's apartment, applicant used the bathroom and washed his hands, as did Love. After the shootings, other witnesses saw applicant in the parking lot dressed in different clothing and watching while the bodies were removed.

At 1:52 a.m. on March 29, Love called Bowers's mother and had a two-minute-and-seven-second conversation with her. Love then sent Bowers's mother a text message, to which she responded at 1:56 a.m. with, "Love yall too!!!" At 1:57 a.m., Love texted applicant, "Tbuck5," Bowers's rap name.

The State also presented evidence that, after the offense, applicant tried to establish an alibi; destroy evidence of his participation, including incriminating texts on his cell phone; and intimidate witnesses such as Henry from cooperating with law enforcement. As additional proof of applicant's motive, the State presented evidence that he and Bowers had not just been friends, but had also been fellow members of a criminal street gang.

Applicant testified in his own defense. He denied having had any role in the shooting and he also denied having any involvement in an organized gang.

The jury charge permitted the jury to convict applicant as a principal or a party. The

jury found applicant guilty as alleged in the indictment. Pursuant to the jury's answers to the special issues, including an anti-parties special issue under Article 37.071, § 2(b)(2), the trial court sentenced applicant to death. This Court affirmed applicant's conviction and sentence on direct appeal. *Cummings v. State*, No. AP-76,923 (Tex. Crim. App. Dec. 17, 2014) (not designated for publication).

In his application, applicant presents fourteen challenges to the validity of his conviction and sentence. The habeas court held an evidentiary hearing on applicant's Claims 1 through 9 and Claim 14. It thereafter entered findings of fact and conclusions of law recommending the denial of relief on Claims 1 through 9 and Claim 14. The habeas court entered no findings of fact or conclusions of law or a recommendation regarding Claims 10 through 13.

We have reviewed the record regarding applicant's allegations. Claims 10, 11, 12, and 13, in which applicant raises constitutional challenges to Texas's capital sentencing scheme, are procedurally barred because habeas is not a substitute for matters which were or should have been raised on direct appeal. *See Ex parte Hood*, 304 S.W.3d 397, 402 n.21 (Tex. Crim. App. 2010) ("[T]his Court does not re-review claims in a habeas corpus application that have already been raised and rejected on direct appeal."); *Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004) ("It is 'well-settled that the writ of habeas corpus should not be used to litigate matters which should have been raised on direct appeal.'").

In Claims 1 through 9 and 14, applicant alleges that his trial counsel were constitutionally ineffective for failing to: thoroughly rebut eyewitness Nickoll Henry's trial testimony and to present testimony from an eyewitness identification expert (Claim 1); present expert testimony from a forensic linguist to support applicant's testimony about incriminating messages found on his cell phone (Claim 2); present testimony from a gang expert to rebut the State's assertion that applicant was affiliated with the Bloods gang (Claim 3); object to the admission of certain irrelevant and inflammatory photographs and a rap music video, which the State asserted were probative of applicant's gang affiliation (Claim 4); object to the admission of an irrelevant and highly prejudicial photograph of a woman holding an AK-47 firearm (Claim 5); object to alleged victim impact evidence that was presented by the State at the guilt-innocence phase (Claim 6); object to hearsay testimony given by Marion Bible, one of the surviving victims of the shooting (Claim 7); fully investigate and present certain lay witness testimony at the punishment phase (Claim 8); present expert testimony from a social historian at the punishment phase (Claim 9); and preserve the record for appeal (Claim 14). However, applicant fails to meet his burden under *Strickland v. Washington*, 466 U.S. 668 (1984), to show by a preponderance of the evidence that his counsel's representation fell below an objective standard of reasonableness and that there was a reasonable probability that the result of the proceedings would have been different but for counsel's deficient performance. *See Ex parte Overton*, 444 S.W.3d 632, 640 (Tex. Crim. App. 2014) (citing *Strickland*, 466 U.S. at 688).

As to the habeas court's findings of fact and conclusions of law, we decline to adopt them.[2]  *See Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008).  Instead, based upon our independent review of the record and consistent with our role as the ultimate factfinder in habeas corpus proceedings, we deny relief.

IT IS SO ORDERED THIS THE 28TH DAY OF MARCH, 2018.

Do Not Publish

---

[2]  We also decline to adopt the document in the habeas record entitled, "Observations and Opinion," to the extent that this document can be construed as the habeas court's supplemental findings of fact and conclusions of law.