**Opinion issued April 11, 2019**



In The

# Court of Appeals

**For The**

# First District of Texas

———————————

## NO. 01-17-00811-CR

———————————

**JOHN FRANKLIN BELL, JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 506th District Court**
**Waller County, Texas**
**Trial Court Case No. 14-12-14933**

---

## MEMORANDUM OPINION

A jury found appellant, John Franklin Bell, Jr., guilty of continuous sexual abuse of a child, and the trial court sentenced him to 55 years' imprisonment. *See* TEX. PENAL CODE § 21.02. Bell raises four issues on appeal. First, he contends

that the trial court erred by allowing an improper commitment question during voir dire. Second, Bell argues that the trial court erred by denying his motion for new trial based on ineffective assistance of counsel. Third, he contends that the offense statute is facially unconstitutional, and fourth, he argues that his sentence is a violation of the Due Process Clause of the Fourteenth Amendment. *See* U.S. CONST. amend. XIV. We affirm.

## Background

Bell became R.M.'s stepfather when she was five or six years old. R.M., her mother, and Bell resided in Waller County, and R.M considered Bell her father. Bell and R.M.'s mother had two daughters together who also lived with the family.

On February 16, 2012, when she was a 15-year-old freshman in high school, R.M. reported to her school counselor that she was being touched inappropriately by Bell. The counselor testified at trial that R.M. began by writing a statement that she had been sexually abused, but as she became more comfortable, she made an oral disclosure of abuse. R.M. told her counselor that the abuse began when she was about ten years old. She described specific incidents of abuse that happened over the years and said that the latest incident occurred the night before. She told the counselor that this was the first time she was reporting the abuse. Based on the information, the counselor notified Child Protective Services (hereinafter "CPS") of R.M.'s outcry of sexual abuse.

2

The outcry triggered a criminal investigation. Lieutenant H. Sanders was assigned to the case and testified at trial. She was employed by the Waller County Sheriff's Office as a peace officer who specialized in sexual assault investigations. After receiving notice that R.M. had made an outcry, Lt. Sanders scheduled a forensic interview with R.M. that took place the next day. Lt. Sanders monitored R.M.'s forensic interview via closed circuit television but did not participate in the interview process. R.M. also had a sexual assault examination.

On the same day that she received the outcry notice, Lt. Sanders contacted R.M.'s mother, Laura Bell, by phone to get consent to retrieve evidence from R.M.'s bedroom. Initially, Laura Bell was cooperative and agreed to allow Lt. Sanders to retrieve items from the home for an investigation. Lt. Sanders retrieved several items. About a week later, Laura realized that R.M. was having explicit online communications with a 57-year-old man later identified as Patrick Mason. Laura phoned Lt. Sanders to report the discovery, and Lt. Sanders scheduled a second interview with R.M.

During the interview, R.M. admitted that she lied during the forensic interview when she did not disclose that Mason was the first person she told of her abuse. Instead, she said her school counselor was the first person because she knew her online communication with Mason was inappropriate and she did not want to

get in trouble. R.M. also disclosed that it was Mason who encouraged her to tell someone that she was being sexually abused.

Based on information in the interview, Lt. Sanders obtained a search warrant on February 21, 2012, seeking information that would corroborate R.M.'s disclosure of her online communications and outcry to Mason. She obtained R.M.'s cell phone and computers, and analysts retrieved communications between R.M. and Mason. Lt. Sanders read the communication and noted that R.M. told Mason about her abuse on February 15, 2012, the day before she reported it to the school. He encouraged her to disclose the abuse, just as R.M. had said during her interview with Lt. Sanders. Lt. Sanders also reviewed photographs recovered from R.M.'s camera and home computer. R.M told Lt. Sanders she sent pictures to Mason, described the locations where the photographs were taken, and described the clothing she was wearing. Lt. Sanders identified the pictures in the materials recovered. She noted that they were not sexually explicit or suggestive and were exactly as R.M. described in the interview. Lt. Sanders also confirmed Mason's identity and contacted him in Michigan. He corroborated R.M.'s disclosures.

By two weeks into the investigation, R.M.'s mother no longer supported her and believed she fabricated the story of abuse. After the outcry, R.M. never lived at home again. She and her two younger half-sisters first went to stay with their maternal grandmother. R.M.'s grandmother also did not believe her. R.M. stayed

4

briefly with an aunt before going back to her grandmother's, and eventually she lived at the Methodist Children's Home for four years.

R.M. testified at a jury trial five years later, when she was 20 years old. She explained that the abuse began when she was 10 or 11 years old and the earliest she can remember was an incident in the laundry room. She explained that she was helping Bell do laundry. Bell told R.M. to sit on a deep freezer and instructed her to pull aside her shorts. Bell approached with a "long metal-like object" that she later learned was a vibrator and touched it both inside and outside her vagina. He asked her how it felt. R.M. did not recall her response, only wishing that the event would end. She did as she was told because she feared a spanking, and she did not tell her mother because she did not comprehend the nature of the touching at the time.

She testified to a second incident of abuse in her bedroom when she was in the seventh grade. She recounted wanting something a child would want, such as food, a book, a toy, or money, and asking Bell for it. Bell told her to remove her clothing and sit on her bed. He then conducted an "anatomy lesson," explaining various parts of her body as he touched them, including touching her breasts and penetrating her vagina with his finger. When he was finished, Bell gave R.M. the item she asked for. She did not disclose the abuse for fear of not being believed and "losing everything."

5

She testified to a third incident in a field in summer of 2011 at 14 years old. After running errands, R.M. asked Bell to buy her lunch and books. He agreed if she would "do something" for him. Once she agreed, he purchased books and fast food. He drove R.M. to a field near their home, parked his truck, and touched her genitals, penetrating her vagina with his fingers. He also placed his mouth on her breasts. She did not disclose this incident because she was scared. R.M. verified the location of the field on a map during her testimony.

R.M. recounted additional incidents of sexual abuse between ages 12 and 14. These incidents involved Bell touching her breasts and genitals with his fingers and mouth and penetrating her vagina with his mouth and tongue. They occurred in her bedroom or in Bell's pickup truck on the backroads of Waller County. She described that the abuse occurred monthly in exchange for something she had asked for. She explained that she did not tell anyone because she feared for her safety. On one occasion, she threatened to tell someone, and Bell responded that she "might end up dead" and nobody would blame him.

The final incident of sexual abuse occurred on February 15, 2012, the night before she reported to her school counselor. She asked for money for a book fair, and Bell agreed to give it to her if she did something for him. Her mother and siblings were asleep in their rooms. Bell instructed her to shower and shave her genital area. She caught him watching her shower, and he left the bathroom when

he realized she had noticed. After the shower, she went to her bedroom. Bell placed his mouth on R.M.'s genitals and told her that he would give her extra money for two extra minutes of access. He set a timer for the additional minutes. He gave her $40 for the book fair, and she purchased books and pens.

R.M. testified that she had to ask permission to use the internet in the home and accessing the internet required a password key provided by Bell. She testified that he used internet access to force her to submit to additional acts of sexual abuse. She explained that she first accessed online chat rooms at school, but then she accessed them from her computer in her bedroom. She began regularly communicating with Patrick Mason. Initially, she told him that she was 23 years old and believed him to be in his 50s. Eventually, she disclosed her real age, and they continued to communicate online, often in a sexually explicit manner. Mason was adamant that they would never meet as long as she was under 18, and she never believed that they would have a relationship beyond online chatting. They exchanged photographs, but the photographs were not sexually explicit.

R.M. testified that she contacted Mason over the internet after Bell left her room on the night of February 15, 2012. She told him she was being sexually abused, and he encouraged her to tell a counselor. This prompted her to tell the counselor at school the next day.

She continued to have explicit conversations by text and internet with Mason after she reported the abuse. One incident occurred while she was living with her grandmother. Her mother found out and punished her with respect to phone and computer access. The same day, she requested to move to her aunt's house because her grandmother did not believe her about the abuse. Her mother also did not believe her. Eventually she moved into the Methodist Children's Home.

In addition to testimony from the school counselor and Lt. Sanders, the State called Fiona Remko, a licensed clinical social worker who conducted a forensic interview with R.M. She explained the forensic interview process and explained the dynamics of child abuse, such as grooming behaviors a perpetrator uses with a child victim to set the stage for sexual abuse. She also explained that in her experience, when a child discloses abuse, the entire family often blames the child, directing all their anger at the child and cutting the child out of their lives. Finally, she explained that children who suffer sexual abuse may engage in inappropriate or promiscuous behaviors.

Rachel Bryant, the nurse who performed the sexual assault examination on R.M., testified about the process of the examination, the information that R.M. relayed to her about abuse during the examination, and her findings. She explained that by the time she conducted the exam, R.M. had washed, urinated, ate and drank, and changed clothes, decreasing any possible DNA sample. She explained

8

that the fact that R.M. did not have genital injuries was still consistent with having been sexually assaulted, including that in ten years of conducting between 1,500 and 2,000 exams, it was rare to see an injury.

Bell and his wife testified. Bell denied all allegations of sexual abuse. He described R.M. as having problems with discipline from the time he came into her life and acknowledged that he was the disciplinarian. She understood that if she disobeyed him, she would get in trouble. He referred to specific instances of spanking because she spoke disrespectfully to her mother. He admitted that he could restrict her internet access, and he was angry when he found out that R.M. was communicating with Mason because she had claimed that she was doing homework on the computer. He believed that Mason and R.M. conspired to falsely accuse him of sexual assault so that they could be together, but he conceded that to do so they would have to formulate and discuss a plan. He agreed that none of the online communication between them discussed a plan to do so.

Bell acknowledged that many details of R.M.'s disclosure were accurate. For example, R.M. and Bell stayed up later than the other people in the house. Her bedroom was on the opposite side of the house from her parents' bedroom. He and R.M. frequently went places together alone in his truck, such as for fast food and to buy books. They were alone in a field together more than once, and he woke R.M. up each morning.

9

Bell also acknowledged that he spoke with a law enforcement officer on the day after R.M. disclosed abuse to her counselor. When questioned at trial, he agreed that when the officer asked if he touched R.M.'s breast when she was ten years old, he did not deny it but instead asked if she even had breasts at that age. When the officer confronted him with R.M.'s accusation that he penetrated R.M.'s vagina with his finger, he did not deny it but instead asked if it would "leave DNA." When the officer presented Bell with R.M.'s disclosure of specific details of the abuse, he stated, "In other words, it doesn't look good for me." And at the end of his interview, Bell reviewed R.M.'s disclosure and responded, "No matter what, this is a black eye for both of us."

Bell also acknowledged that he volunteered specific information to the officer without being questioned about it. Before the officer disclosed that R.M. had alleged he went in her bathroom while she was showering, Bell told the officer that he had been in the bathroom with R.M. while she was showering, but then he explained it was to kill a bug. He also volunteered that he had given R.M. $40 for the book fair before her outcry, even though the officer had not mentioned R.M.'s allegation that the $40 was payment for sexual contact.

Laura Bell testified that she did not believe R.M. She testified that she thought the Methodist Children's Home would be a safe environment for R.M. to get counseling for "somebody who is, you know, able to lie about something like

10

this." She acknowledged that in five years, R.M. never recanted or changed the story she told her counselor, the investigating officer, the nurse who examined her, the State's attorney, CPS, and the jury.

The jury found Bell guilty. Following a sentencing hearing, the court sentenced him to 55 years' imprisonment.

Bell filed a motion for new trial alleging ineffective assistance of counsel and a motion challenging the constitutionality of the statute underlying his conviction. A hearing on the motion for new trial was held on October 24, 2017. Bell's trial counsel testified. The trial court denied both motions, and this appeal followed.

## Analysis

On appeal, Bell argues that the trial court erred by allowing an improper commitment question during voir dire and by denying his motion for a new trial based on ineffective assistance of counsel. He also argues that the statutory scheme for continuous sexual abuse of a child is unconstitutional and that his sentence is a result of "judicial vindictiveness."

## Commitment Question

Bell argues that the trial court reversibly erred by allowing an improper commitment question during voir dire because the question did not give rise to a valid challenge for cause. The State argues that the question was either not a

commitment question or if it was, it was not improper. Even if the question was improper, we hold that any error was harmless.

## A.      Question to the Veniremen

During voir dire, the State questioned the venire members about their ability to judge a child's credibility. The prosecutor asked the panel what factors they would consider in determining if a child was being truthful. Panel members listed several factors. After determining that no one felt incapable of judging a child's credibility, the State questioned the panel on why a witness might be reluctant to testify. Veniremen responded with various reasons, including not wanting to create conflict in the family. As a follow up question, the State asked, "if a parent is non-supportive of the child, does that mean the child is lying?" When the venire indicated no, the State asked, "Is there anyone who, if you find out that there is a non-supportive parent, that that's going to affect your determination of that child's credibility?" The court overruled Bell's objection that this was an improper commitment question. The veniremen answered, one verbally and the others by silence, that their determination of a child's credibility would not be affected by knowledge that a parent did not support the child.

Bell argues that the question is an improper commitment question that did not give rise to a valid challenge for cause.

**B.    Legal Standard**

We review a trial court's ruling on an allegedly improper commitment question during voir dire for an abuse of discretion. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).

A commitment question during voir dire is one that commits a prospective juror to resolve, or refrain from resolving an issue a certain way after learning a particular fact. *See Hernandez v. State*, 390 S.W.3d 310, 315 (Tex. Crim. App. 2012); *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). "[A]n attorney cannot attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts." *Allridge v. State*, 850 S.W.2d 471, 480 (Tex. Crim. App. 1991). Commitment questions are typically impermissible because they serve no purpose other than to commit the jury to a specific set of facts before the presentation of any evidence. *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005). Improper commitment questions are prohibited to "ensure that the jury will listen to the evidence with an open mind—a mind that is impartial and without bias or prejudice—and render a verdict based upon that evidence." *Sanchez*, 165 S.W.3d at 712. Not all commitment questions are improper. *Standefer*, 59 S.W.3d at 181.

## C. Analysis

Assuming without deciding that the State's question was an improper commitment question, any error by the trial court was harmless. We address the potential harm of the State's alleged improper commitment question by applying rule 44.2(b). *See Sanchez*, 165 S.W.3d at 713; TEX. R. APP. P. 44.2(b). We focus "upon whether a biased juror—one who explicitly or implicitly promised to prejudge some aspect of the case because of the State's improper questioning— actually sat on the jury." *Sanchez*, 165 S.W.3d at 713. The ultimate harm question is whether the defendant was tried by an impartial jury, or conversely whether the jury or any specific juror was "poisoned" by the State's improper commitment question on a legal issue or fact that was important to the determination of the verdict or sentence. *Id.*

Here, no prospective jurors answered that their evaluation of a child witness's credibility would be affected by learning that the child's parent did not support her. Rather, the potential jurors acknowledged that they could independently judge a child's credibility, regardless of parental support. After reviewing the record, we conclude that the record does not demonstrate that the jurors who sat on Bell's jury were partial or biased. Bell does not show harm. The jurors had the opportunity to consider R.M.'s testimony, her mother's testimony,

14

and Bell's testimony and weigh the credibility of each. Therefore, any alleged error was harmless. *See* TEX. R. APP. P. 44.2(b).

## Ineffective Assistance of Counsel

Bell asserts his trial counsel was ineffective because he did not: (1) obtain a ruling on the admissibility of R.M's testimony regarding discipline at the Methodist Children's Home; (2) make a motion in limine or object to R.M.'s testimony that her aunt told her that she believed her; (3) make a motion in limine or object to Lt. Sanders referring to R.M. as "victim"; (4) make a motion in limine or object that Lt. Sanders, as lead investigator, was not qualified to testify as an expert on sexual abuse; (5) request a limiting instruction or move for a mistrial after testimony about the results of a CPS investigation. He argues that each of his counsel's errors created a reasonable probability that the outcome of the proceeding would have been different. Bell raised each of these issues in a motion for new trial.

We hold that Bell has not established that his counsel's performance was so ineffective that there is a reasonable probability the result of the trial would have been different, and the trial court did not abuse its discretion in denying his motion for new trial. We address each claim of ineffective assistance in turn.

15

## A. Standard of Review

When, as here, the defendant raises an ineffective assistance claim in a motion for new trial that is rejected by the trial court and reasserted on appeal, we "analyze the ineffective assistance of counsel issue as a challenge to the denial of the motion for new trial." *Starz v. State*, 309 S.W.3d 110, 118 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). We review a trial court's denial of a motion for new trial for an abuse of discretion. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). "We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable." *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006).

"In the absence of express findings, as here, we presume that the trial court made all findings in favor of the prevailing party." *Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013). We presume that all reasonable factual findings that could have been made against the losing party were made against that losing party. *Colyer*, 428 S.W.3d at 122; *see also Shamim v. State*, 443 S.W.3d, 316, 321 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (We ascribe to the court "implicit factual findings that support that trial judge's ultimate ruling on that motion when such implicit factual findings are both reasonable and supported by the record.") (internal quotation omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Riley*

*v. State*, 378 S.W.3d 453, 456 (Tex. Crim. App. 2012) *overruled on other grounds by Miller v. State*, 548 S.W.3d 497 (Tex. Crim. App. 2018).

The trial court is the sole judge of witness credibility at a hearing on a motion for new trial, whether presented through live testimony or affidavit. *Okonkwo*, 398 S.W.3d at 694. We defer to a trial court's findings of historical facts as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Riley*, 378 S.W.3d at 458.

To show that the trial court abused its discretion in denying appellant's motion for new trial based on ineffective assistance of counsel, the record must reflect that (1) his trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). Appellant has the burden to establish his claim by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *see also Strickland*, 466 U.S. at 697. "We review de novo the trial court's decision on the [*Strickland*] prejudice prong while giving deference to the trial court's implied resolution of the

underlying factual determinations supporting denial of the motion. . . ." *Straight v. State*, 515 S.W.3d 553, 564 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

To establish the first prong, deficient performance, Bell must prove that his attorney's performance "'fell below an objective standard of reasonableness' under prevailing professional norms." *Ex parte Moore*, 395 S.W.3d 152, 157 (Tex. Crim. App. 2013) (quoting *Strickland*, 466 U.S. at 688); *see also Ex parte Martinez*, 330 S.W.3d 891, 900 (Tex. Crim. App. 2011).

To prove harm, Bell "must demonstrate that he was prejudiced by his attorney's performance or that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Ex parte Moore*, 395 S.W.3d at 158 (footnote omitted) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome [of the proceeding]." *Id.* at 158 n.3 (quoting *Strickland*, 466 U.S. at 694).

Additionally, "[a]ny allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *accord Burgess v. State*, 448 S.W.3d 589, 602 (Tex. App.—Houston [14th Dist.] 2014, no pet.). "There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Thompson*, 9 S.W.3d at 813.

Therefore, Bell "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Ex parte Moore*, 395 S.W.3d at 157 (quoting *Strickland*, 466 U.S. at 689).

Appellate courts view matters "from the viewpoint of an attorney at the time he acted, not through 20/20 hindsight." *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012); *see also Ex parte Overton*, 444 S.W.3d 632, 640 (Tex. Crim. App. 2014). We consider the totality of the representation, not counsel's isolated acts or omissions. *Ex parte Jimenez*, 364 S.W.3d at 883. The mere fact that another attorney might have pursued a different tactic demonstrate ineffectiveness. *Id.* The appellant bears the burden to demonstrate that no plausible reason exists for an act or omission. *Toledo v. State*, 519 S.W.3d 273, 287 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).

To establish ineffective assistance of counsel based on a failure to object, Bell must demonstrate that the trial court would have committed harmful error in overruling the objection had trial counsel objected. *See Vaughn v. State*, 931 S.W.2d 564, 566–67 (Tex. Crim. App. 1996); *Toledo v. State*, 519 S.W.3d at 287.

**B. Analysis**

Bell asserted each of his complaints of ineffective assistance of counsel in a motion for new trial, and his trial counsel testified regarding each allegation. We address each complaint in turn.

19

### 1. Failure to obtain a ruling on admissibility of testimony regarding R.M.'s discipline at the Methodist Children's Home

Bell first argues that his counsel was ineffective for failing to obtain a ruling on whether he could question R.M. about her disciplinary history at the Methodist Children's Home.

Before trial, the court granted the State's motion in limine and required defense counsel to obtain a ruling outside the presence of the jury before offering testimony that R.M. violated rules of the Methodist Children's Home and was disciplined. During direct examination, the State elicited testimony that R.M. earned levels of trust and specific freedoms during her four years at the home. Before cross-examination began and outside the presence of the jury, Bell's counsel argued that this testimony created a false impression that R.M. behaved well at the home and had no problems. He argued that the State's questions opened the door to testimony that she had been disciplined for sending partially clothed photos of herself from a computer. The photos were taken after R.M. turned eighteen and many years after her outcry.[1] The State argued that this was a violation of Rule of Evidence 608(b), which prohibits the use of specific instances of conduct to impeach a witness's credibility except to expose bias or interest or to rebut an affirmative representation made on direct examination. *See* TEX. R. EVID.

---

[1] R.M. lived at the Methodist Children's Home or in an apartment affiliated with it in Waco until just before she turned 19.

608(b). The State also argued that it was too remote in time from the disclosure of abuse to be relevant. The court instructed Bell's counsel to begin cross-examination on topics leading up to the outcry and beginning of the investigation, and then, counsel could approach again to see if he had laid further foundation to question R.M. about her conduct after reaching majority. Counsel did not approach the bench again on this topic.

During the hearing on the motion for new trial, Bell's trial counsel testified that he strategically chose not to approach the bench again during cross-examination because he believed he did not meet the foundation that the trial court asked him to make.

Given trial counsel's testimony, Bell has not overcome the strong presumption that counsel's actions and decisions were reasonably professional and motivated by sound trial strategy. *Thompson*, 9 S.W.3d at 813. Counsel testified that he had a sound strategy for not approaching the bench because he believed he did not meet the evidentiary standard the court requested. The trial court could evaluate credibility and demeanor and was present for the testimony during both the trial and the hearing on the motion. *See Riley*, 378 S.W.3d at 458 (explaining we defer to the trial court's findings of facts as well as mixed questions of law and fact that turn on credibility and demeanor). The trial court did not abuse its discretion in rejecting Bell's claim of ineffective assistance on this ground.

## 2. Failure to object to opinion testimony

Bell argues that counsel was ineffective for failing file a motion in limine or object to R.M.'s testimony that her aunt told her she believed her because the statement was inadmissible hearsay.

At trial, while cross-examining R.M., Bell's counsel established that R.M.'s mother punished R.M. by taking her phone and denying her internet access after she discovered that R.M. was still communicating with Mason. At the time, R.M. lived with her grandmother. Counsel then asked if R.M. asked Lt. Sanders to move to her aunt's house on the same day that she was punished at her grandmother's. R.M. responded "yes." On redirect, the State asked R.M. if she asked to live with her aunt because her mother caught her chatting online, and R.M. replied that there was another reason. She explained that her grandmother did not believe her, her grandfather ignored her, and her aunt, "[S]he said she believes me. She supports me."

At the motion for new trial hearing, trial counsel stated that he would have filed a motion in limine if he could have foreseen this testimony, but that he did not foresee it and he admitted that in retrospect, he should have objected to it. Defense counsel could not have anticipated that R.M. would have an alternate explanation to move to her aunt's residence. Therefore, his failure to file a motion in limine in advance was not unreasonable. *Ex parte Moore*, 395 S.W.3d at 157.

Trial counsel was not ineffective for failing to object. Hearsay is a statement that "[t]he declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement." TEX. R. EVID. 801(d). R.M.'s explaining that her aunt told her she believed her was not hearsay. It was not offered to prove the truth of the matter asserted, that her aunt believed her, but instead, it was offered to explain why R.M. asked to move. The testimony was not hearsay and was therefore admissible. Counsel is not ineffective for failing to object to admissible evidence. *Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004).

### 3. Failure to object to references to R.M. as "victim"

Bell argues that his counsel was ineffective for failing to object when Lt. Sanders referred to R.M. as "victim" when referencing a letter R.M. had written.[2]

---

[2]   State:          And so how do you start your investigation? You've got this notice that an outcry of sexual abuse has been made at the school. What do you do?

   Lt. Sanders:   First we went ahead and sent a deputy to find out what exactly was going on as far as getting the information from the outcry witness. Typically we do not talk to the victims ourselves in the very beginning because we like to get them forensically interviewed. A forensic interview is done by someone who specializes in speaking and doing forensic interviews. So the deputies went to the scene, they actually retrieved a letter that the victim wrote. And they ended up bringing that information back and I received the information from the deputies about the outcry that happened at the school to a counselor.

Bell argues that by referring to R.M. as the "victim," Lt. Sanders communicated an inadmissible opinion that Bell sexually assaulted R.M.

At the hearing for the motion for rehearing, Bell's trial counsel testified that in retrospect, he could have filed a motion in limine to prohibit law enforcement from referring to R.M. as "victim," but he also testified that officers were using the word in a specific context. He testified that he "probably" should have objected when Lt. Sanders referred to R.M. as the "victim" but he did not believe that the reference bolstered R.M.'s credibility for the jury.

The trial court's decision to deny Bell's motion for new trial on this ground is not outside the zone of reasonable disagreement. *Colyer*, 428 S.W.3d at 122. At least one court of appeals has held that counsel's own use of the word "victim" was not reversible error. *See Cueva v. State*, 339 S.W.3d 839, 864 (Tex. App.—Corpus Christi 2011, pet. ref'd). That is because "the term 'victim' is relatively mild and non-prejudicial, especially given that courts have held invocation of far stronger terms did not amount to reversible error." *Id.* (noting the Court of Criminal Appeals has held that the terms "slaughter," and "this killer" were not reversible error and has used the word "victim" in its own writings). Though counsel agreed that in retrospect he could have objected, from the viewpoint of an attorney at the time, given that the use of "victim" was in passing and used to describe an investigative process, it would have been reasonable not to object to avoid drawing

the jury's attention to the characterization. *Ex parte Jimenez*, 364 S.W.3d at 883. Bell has not demonstrated that no plausible reason exists for his counsel's omission, and the trial court did not abuse its discretion in denying on this ground. *See Toledo*, 519 S.W.3d at 287.

### 4. Failure to object to officer's opinion about R.M.'s conduct

Bell argues that his counsel was ineffective for failing to object when Lt. Sanders testified that R.M.'s behavior was consistent with that of a child survivor of sexual abuse. Lt. Sanders testified as follows:

State:	Based on the years that you have worked on these kind of cases, is it uncommon for a child who has been sexualized at a very young age to then act out in the way that R.M. was behaving online?

Lt. Sanders: It's very common.

State:	Well give us an idea of what you personally have witnessed and observed in your investigations?

The State argues that Lt. Sanders testified based on her 17 years' experience as an investigator of sex crimes, and that her testimony rebutted the defense's theory that R.M.'s online and texting behavior was consistent with normal teenage behavior.

At the hearing on the motion for new trial, counsel testified that he did object to Lt. Sanders testifying as an expert. He admitted that if he were going to retry the case, he would file a motion in limine.

25

Even if counsel's actions were ineffective, Bell fails to show that he was prejudiced by counsel's decision. The same information was presented to the jury by a later witness. Fiona Remko, an expert in the field of child sexual abuse and forensic interviewing of children, shared a similar opinion of child survivors of sexual abuse. She testified to the following:

State:      Finally, with children that—that suffer sex abuse and are sexualized at a very young age, is it uncommon for them to engage in inappropriate behaviors or even promiscuous type behaviors?

Remko:    That's not uncommon at all. A lot of kids, especially if abuse has been ongoing for quite a while, they really confuse in their head the sexual part with love and affection and so they start to equate that in order for somebody to show that they love you that there's a sexual component to it, too. And so kids oftentimes seek that out, especially if their emotional needs aren't being met somewhere else, so they can become promiscuous because that's how they've been taught to show love and affection obviously in an unhealthy way.

Given that Remko gave a similar opinion, Bell cannot demonstrate that he suffered prejudice because of Lt. Sanders's comment. Bell fails to show that the outcome of the trial would have been different without Lt. Sanders's testimony. *Ex parte Moore*, 395 S.W.3d at 158.

5.      **Failure to request an instruction to disregard CPS investigation result testimony or move for a mistrial**

In his last ineffective assistance of counsel argument, Bell contends that his counsel was ineffective for failing to request an instruction for the jury to disregard

testimony that CPS found there was reason to believe that abuse occurred. Counsel objected to the State's questions that referenced the finding, and the court asked the State to rephrase the questions. When the State referenced the finding again, defense counsel objected again, and the objection was overruled. In the motion for new trial and on appeal, Bell argues that his trial counsel should have requested a limiting instruction or moved for a mistrial. His trial counsel testified and explained that in hindsight, there may have been reasons to file a motion in limine regarding the CPS conclusion, but at the time, he had strategic reasons not to file a motion in limine regarding the results of the CPS investigation. He wanted the jury to hear that there was no finding of abuse for the two younger children, and they were too young to testify themselves. When asked if he was concerned that the jury would defer to CPS's judgment that Bell had abused R.M., trial counsel responded that he was not concerned, and he wanted the jury to credit CPS's finding that there had been no abuse of the other children. This fact supported his theory that R.M. made up the abuse, as the jury might believe that evidence that the other children were not abused supported a conclusion that no children in the home were abused.

Given counsel's testimony regarding his strategy, Bell has not demonstrated that the trial court abused its discretion when it denied his motion for new trial based on this complaint.

We overrule Bell's ineffective assistance of counsel allegations.

## Constitutionality of the Offense Statute

In his third issue, Bell argues that the statute establishing the punishment range for the offense of continuous sexual abuse of a child is facially unconstitutional in violation of the Due Process Clause of the Fourteenth Amendment. *See* U.S. CONST. amend. XIV. He argues that there is no set of circumstances under which the statutory punishment scheme for the offense would operate constitutionally. The State argues that he attempts to support his facial challenge with an "as applied" argument and he has not met his burden to establish that the statute is invalid under all circumstances. We agree with the State.

### A.    Standard of Review and Applicable Law

A facial constitutionality challenge is an attack on the entire statute itself rather than a particular application of it. *City of Los Angeles v. Patel*, ⸺ U.S. ⸺, 135 S. Ct. 2443, 2449 (2015). A successful facial challenge to a statute's constitutionality requires a showing that the statute operates unconstitutionally in all possible circumstances; in other words, no set of circumstances exists under which the statute would be constitutionally valid. *McGruder v. State*, 483 S.W.3d 880, 883 (Tex. Crim. App. 2016). Determining whether a statute is facially unconstitutional is a question of law that we review de novo. *Ex parte Lo*, 424 S.W.3d, 10, 14 (Tex. Crim. App. 2013); *Toledo v. State*, 519 S.W.3d at 279.

28

The party who challenges a statute bears the burden to establish that it is unconstitutional. *Peraza v. State*, 467 S.W.3d 508, 514 (Tex. Crim. App. 2015). Courts are to consider the statute only as it is written, rather than how it operates in practice. *Salinas v. State*, 464 S.W.3d 363, 367 (Tex. Crim. App. 2015). A statute is presumed to be constitutional. *See* TEX. GOV'T CODE § 311.021(1); *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002).

Section 21.02 of the Texas Penal Code is entitled "Continuous Sexual Abuse of Young Child or Children." It states that a person commits the offense if:

> (1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and

> (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense.

TEX. PENAL CODE § 21.02(b).

An offense under 21.02 is a first-degree felony, punishable by life imprisonment or a term of "not more than 99 years or less than 25 years." TEX. PENAL CODE § 21.02(h).

**B.    Analysis**

Bell fails to meet his burden to establish a facial challenge to section 21.02. Instead, he argues that the statute could result in an irrational or unfair result as

applied to a hypothetical defendant. He explains that a hypothetical defendant who has vaginal, anal, or oral sex with a child over six years old during a less than 30-day period would commit aggravated sexual assault and face a punishment range of five years to life with the possibility of parole. *See* TEX. PENAL CODE § 22.021 (aggravated sexual assault); TEX. GOV'T CODE § 508.145(d-1) (eligibility for parole). In contrast, a person who touches a child's genitals over clothing more than once in a period that is over 30 days commits continuous sexual abuse of a child and must serve 25 to 99 years or life in prison without the possibility of parole. *See* TEX. PENAL CODE § 21.02 (continuous sexual abuse of a child) and TEX. GOV'T CODE § 508.145(a) (prohibiting parole for the offense).

Even if Bell has hypothetically demonstrated a circumstance where a defendant could be charged with an arguably more serious sex offense and serve a lesser sentence eligible for parole than a defendant who perpetrates an arguably less severe version of sexual abuse over a longer period, this does not meet the burden for a facial constitutional challenge. A single hypothetical application of the statute is irrelevant. *See Salinas*, 464 S.W.3d at 368. To establish a facial challenge, Bell must establish that the statute can never be constitutionally applied to any Texas defendant charged with continuous sexual abuse of a child under any circumstances. *Peraza*, 467 S.W.3d at 514. Because courts are to consider the statute only as written, and not how it operates in practice, it would be improper to

theorize about one defendant versus another. *See id.* at 515. (explaining in a facial challenge it would be improper to theorize where funds collected and distributed pursuant to a statute might be spent). Bell does not demonstrate that the statute is invalid under all circumstances and has not met his burden for a facial constitutionality challenge. We overrule Bell's third issue.

## Improper Motive at Sentencing

In his fourth issue, Bell argues that the trial court's sentence was a result of an improper motive in violation of the Due Process Clause of the Fourteenth Amendment. *See* U.S. CONST. amend. XIV. He argues that the trial court sentenced him to a harsher sentence because he chose to reject the State's plea offer and to send a message to future litigants. The State argues that the claim is unsupported by the record. After reviewing the record, we hold that there was no indication of bias or partiality by the trial court.

## A.    Standard of Review

Due process requires a neutral and detached hearing body or officer. *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006). A trial court denies a defendant due process when it arbitrarily refuses to consider the entire range of punishment or imposes a predetermined punishment. *Id.*; *Jaenicke v. State*, 109 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). Absent a clear

showing of bias, a trial court's actions will be presumed to have been correct. *Brumit*, 206 S.W.3d at 645; *Jaenicke*, 109 S.W.3d at 796.

**B.    Analysis**

The record does not show any partiality or bias in sentencing. After the jury delivered their verdict, the trial court commented:

> Ladies and gentlemen of the jury, these are among the most difficult cases that I try. I've tried murder cases, drug cases, all kinds of cases; this is literally the toughest kind of case, not only for you; but, frankly, for the attorneys, for the Court, for the court staff. They just are. They're very disgusting. They're just totally difficult to do.
>
> I appreciate your service. I appreciate all of you sticking around for the entire proceedings; the alternates, as well as the jury panel itself.

The court then released the jurors from the admonishment not to discuss the case with anyone.

A few months later, a sentencing hearing was conducted. The judge heard testimony from Bell's expert witness and character witnesses. Upon the conclusion of the evidence, the trial court explained that a jury had found Bell guilty and the trial court, having also heard all of the testimony and evidence, believed that Bell had done what he was accused of "exactly as charged and exactly as proven." The judge then explained the factors he considers in determining a sentence and concluded:

32

> So my role is to balance. . . and weigh all of [the factors] and then . . . I consider those against similar offense for the purposes of having some consistency in my sentencing so that there will be a standard within the community that whenever this Court hears cases of a similar nature, there will be an understanding of where this Court is going to go and the decisions that are going to be made.

The sentencing range for continuous sexual abuse of a child was life or no less than 25 years and no more than 99 years. TEX. PENAL CODE § 21.02(h). The court sentenced Bell to 55 years' imprisonment.

On appeal, Bell contends that the judge vindictively sentenced him to a lengthier sentence for declining a plea bargain to discourage future defendants from doing the same.[3] He relies on *North Carolina v. Pearce*, which established that "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear [in the record]." 395 U.S. 711, 726 (1969) *overruled in part by Alabama v. Smith*, 490 U.S. 794, 801 (1989) (holding that *Pearce* presumption of judicial vindictiveness does not

---

[3] Bell's counsel put the declined offer on the record at the end of pretrial motions.

Court:    You had something to put into the record?

Bell's Counsel: Just, Judge, that an offer was made from the State, and you recall that offer, correct?

Bell:    Yes .

Bell's Counsel: It was ten years deferred and you have elected not to take that offer.

The State then clarified that the offer was made before the State could locate R.M. and was on a lesser included offense.

apply when trial judge imposes greater penalty after remand and full trial than was imposed after prior guilty plea). But this was Bell's first trial and first sentencing, and therefore the presumption of judicial vindictiveness does not apply. After reviewing the record, we find no evidence of partiality, bias, or impropriety in the assessment of sentence.

## Conclusion

We affirm the judgment of the trial court.


Peter Kelly
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.

Do not publish. TEX. R. APP. P. 47.2(b).