# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00272-CR

---

### Ex parte Christopher Lopez

---

**FROM THE 427TH DISTRICT COURT OF TRAVIS COUNTY
NOS. D-1-DC-15-100158 & D-1-DC-15-205012
THE HONORABLE TAMARA NEEDLES, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Christopher Lopez was charged with aggravated kidnapping, aggravated assault family violence, endangering a child, and evading arrest. *See* Tex. Penal Code §§ 20.04, 22.02, .041. Consistent with a plea-bargain agreement, the trial court, after accepting Lopez's guilty pleas, deferred his adjudication of guilt for the aggravated-kidnapping and aggravated-assault offenses, placed him on deferred-adjudication community supervision for ten years for those offenses, and sentenced him to eighteen months in a state jail for the endangering offense. *See* Tex. Code Crim. Proc. art. 42A.101; Tex. Penal Code § 12.35. Almost seven years later and after the State filed motions to adjudicate his guilt, Lopez filed an application for writ of habeas corpus asking the habeas court to discharge him from community supervision, allow him to withdraw his guilty pleas, and convene a trial. Following a hearing, the trial court denied Lopez's writ application. Lopez appeals the trial court's order denying his requested habeas relief. We will affirm the trial court's order.

## BACKGROUND

In August 2015, Lopez was dating Liliana Espinoza, who had a five-year-old son J.D.[1] According to the probable-cause affidavit supporting Lopez's ultimate arrest of which the habeas court took judicial notice, Espinoza and Lopez were in an argument resulting in Lopez approaching her with a pistol and firing the weapon at her feet, causing rocks from the gravel driveway to fly up and hit her on her leg and torso. A neighbor saw the incident who then led Espinoza to his house. At that point, Lopez yelled for J.D. to come to him. After seeing J.D. walking towards Lopez, Espinoza asked Lopez to return her child multiple times, but Lopez refused and walked away with J.D. after removing J.D.'s shoes, which would light up each time J.D. took a step. The neighbor saw Lopez walking away from the property with J.D. and noticed that Lopez had the handgun in his possession. The police were called, responded to the scene, and helped look for J.D.

While some officers searched for J.D., others noticed a bag of ammunition with .45 caliber bullets as well as an empty gun case in Lopez's car, and officers also discovered two .45 caliber casings in the area where Lopez approached Espinoza with a pistol. Another officer talked with Espinoza. The officer noted that Espinoza had injuries on her leg and abdomen. Espinoza related that she had told Lopez that she was going to end their relationship after learning that he cheated on her and that he then threatened to kill J.D. and her. The officer confirmed the threats by looking at Espinoza's text exchanges with Lopez's phone in which the sender from Lopez's phone stated: J.D. "is dead," "Bye bye no more mommy," and "Your dead whore." Approximately ten hours later, Lopez was spotted leaving a nearby wooded area with

---

[1] Because Espinoza's child was a minor at the time of the offense, we will refer to the child by a pseudonym. *See* Tex. R. App. P. 9.10(a) (listing sensitive data in criminal cases).

2

J.D., and Lopez got into his car and drove off with J.D. in the car. During the ensuing chase, Lopez drove his car over 100 miles per hour and nearly hit several police cars before ultimately crashing his vehicle. After examining J.D., the officers noticed that he had injuries to his feet consistent with walking without shoes and had injuries to his face from when the airbag in the car went off. The police took Lopez into custody.

J.D. was scheduled for a forensic interview after he was released from the hospital. While at the child-advocacy center, J.D. noticed for the first time the injuries to his forehead and the bruise on his head, and he refused to talk to the interviewer. During a second interview, J.D. described being in a car with Lopez and described Lopez driving fast while there were police cars around. J.D. stated that Lopez wrecked the car. When discussing his time with Lopez in the woods, J.D. recalled that Lopez was holding a gun and that Lopez and he were hiding in the woods.

Following his arrest, Lopez was charged with aggravated kidnapping, aggravated assault family violence, endangering a child, and evading arrest. The State informed Lopez's attorney that it would consider a plea agreement if Lopez agreed to serve a prison term of at least five years. In addition, the State sent Lopez's attorney an email on January 15, 2016, explaining that Espinoza had told the victim services counselor that she had made false statements to the police and explained that Espinoza told the counselor that she never saw Lopez with a gun that day, that she told the police that Lopez had a gun because she was mad at him for making poor financial decisions, that her visible injuries that day were from falling on a rocky path, and that she hoped Lopez would get community supervision and be released.

A few months later, Lopez filed a motion to substitute his attorney with another attorney, Eric McDonald, and the trial court granted the motion on April 8, 2016. After talking

3

with Lopez and Espinoza and reviewing the discovery in the case, McDonald sent an email to the prosecutors on the case on July 5, 2016, inquiring whether they would agree to a deal in which Lopez pleaded guilty to aggravated kidnapping, aggravated assault family violence, and endangering a child and admitted his guilt to the evading-arrest charge and in which the State agreed to recommend that his adjudication of guilt on the first two offenses be deferred, that he be placed on deferred-adjudication community supervision for ten years for those two offenses, that his guilt for the evading-arrest charge be considered during his punishment for the endangering charge, and that he be sentenced to eighteen months in state jail for the endangering charge. McDonald explained that the deal would benefit Lopez by allowing him to avoid a felony conviction and allowing him to keep his commercial driver's license and his job working for the city. After clarifying some of the terms, one prosecutor responded and said that he would need to look over the details more in depth but was leaning towards agreeing to the proposal. The following day, July 7, 2016, the prosecutor filed with the trial court a notice regarding the existence of *Brady* material, and the notice explained that Espinoza told members of the prosecuting team on February 26, 2016, that she did not see Lopez use a gun on the day in question and that her prior statement indicating otherwise was a lie. The notice was sent to McDonald that same day.

On July 12, 2016, a plea hearing was held, and the trial court approved the terms of the plea agreement and signed the plea paperwork. During the hearing, the parties went over the terms of the agreement, and the trial court inquired whether Lopez understood the terms, knew the potential punishment ranges for the offenses, and was knowingly and voluntarily waiving his rights to remain silent, to confront witnesses, and to a jury trial. Lopez answered that he understood the terms of the agreement, the potential punishment range for each offense,

and the rights that he was waiving by entering the plea agreement, and Lopez related that he was freely and voluntarily giving up his rights. Further, Lopez stated that McDonald went over the plea paperwork with him and that he signed the paperwork, and Lopez pleaded guilty to aggravated kidnapping, aggravated assault family violence, and endangering a child and admitted his guilt to the evading-arrest charge. After accepting Lopez's pleas and consistent with the terms of the agreement, the trial court deferred his adjudication of guilt for the aggravated-kidnapping and aggravated-assault charges, placed him on deferred-adjudication community supervision for those offenses for ten years, and considered his guilt for the evading-arrest charge when imposing an eighteen-month sentence for the endangering charge.

Starting in October 2020 and continuing through October 2022, the State filed multiple motions to adjudicate Lopez's guilt alleging that he failed to comply with the terms of his deferred-adjudication community supervision by failing to report to the supervision office and committing additional offenses by intentionally and knowingly possessing a handgun on multiple occasions, intentionally or knowingly possessing a handgun that had its serial number removed, recklessly driving a motor vehicle, discharging a firearm at more than one vehicle, shooting more than one person, threatening someone with bodily injury while displaying a deadly weapon, committing multiple aggravated robberies, and assaulting a police officer.

A few months later, on March 13, 2023, Lopez filed an application for writ of habeas corpus seeking to have the habeas court discharge him from community supervision, allow him to withdraw his guilty plea, and convene a trial. Specifically, Lopez asserted that he was entitled to his requested relief because McDonald provided ineffective assistance of counsel by failing to conduct an independent investigation, retain an investigator or ask for one to be appointed, and retain an expert to look at mitigating factors and his mental health.

5

During the habeas hearing, Lopez called McDonald as a witness. In his testimony, McDonald related that he had practiced law for 27 years and had been practicing criminal law for 25 years. Regarding his representation of Lopez, McDonald stated that he replaced Lopez's former attorney on April 8, 2016, and worked on the case for months. Although McDonald could not recall if he asked to see the previous attorney's file, he explained that if he takes over a case and if it appears that the prior attorney would have relevant documents, he asks the prior attorney for those documents. Further, he stated that he reviewed all the discovery in the case through Travis County's open discovery program. Although McDonald could not recall for certain whether he watched the forensic interview of J.D. as part of his investigation, he believed that he likely did and looked at the interview summary, and he explained that his inability to recall some details was due to the significant time that had passed since he was Lopez's attorney. Next, McDonald admitted that he did not hire an investigator but stated that he did a thorough investigation of the case on his own by talking with Lopez, Espinoza, Lopez's father, and other witnesses, by talking a lot with Lopez about his case, and by going to the prison six or seven times over a short period to discuss the case. For those reasons, McDonald testified that hiring an investigator did not seem necessary.

Although McDonald agreed that it was important to consider a defendant's mental health, he stated that he did not hire or arrange for the appointment of an expert to help evaluate mitigating evidence and that in hindsight it might have been a good idea to hire an investigator or an expert; however, he clarified that having an expert or an investigator would not have made a difference in this case and that he was able to get all of the relevant mitigating information from Lopez and from the presentence-investigation report. Regarding the presentence-investigation report, McDonald testified that it showed that Lopez had a low to moderate risk of recidivism.

6

McDonald admitted that he did not make a written request for the disclosure of any *Brady* information and did not go to the alleged crime scene with a witness, but as stated above, he did review all discovery in the case.

Regarding Espinoza, McDonald stated that she would not have been the State's key witness in the case. Further, he related that from the time he became Lopez's lawyer, he was aware that Espinoza had recanted many of her statements to the police and that this information was confirmed in the *Brady* notice. Moreover, McDonald testified that the State initially wanted Lopez to serve five years in prison, that the State was not negotiating much, that he used Espinoza's recantation as part of the negotiations to make the State consider community supervision, and that the State would not have agreed to a community-supervision term that was less than ten years. Similarly, McDonald recalled that he filed an application for writ of habeas corpus seeking to have Lopez's bond reduced and would have argued if no plea agreement occurred that a reduction was warranted given the recantation and given Lopez's ties to the community. McDonald believed that he had a reasonable strategy and that he got the best deal he could have from the State given the serious allegations and the evidence of Lopez's guilt.

Additionally, McDonald testified that even with the recantation, the State could have proven all the elements of the crimes, particularly where other witnesses to the incident had not recanted or revised their statements to the police. Further, McDonald related that he knew that the State would not have to dismiss the case just because of the recantation, that he had been on a similar case before in which the accused ended up serving more than thirty years in prison even though the alleged victim recanted, and that Lopez provided inculpatory information when talking about the cases. When discussing the plea agreement, McDonald explained that he went over the terms with Lopez, that he discussed the rights that Lopez was waiving, that he came up

7

with a creative counteroffer that Lopez was pleased with because it would allow Lopez to keep his commercial driver's license and keep his job by avoiding a felony conviction, and that Lopez was not bothered by the length of the community supervision because he stated that he would not commit any crimes in the future. McDonald testified that Lopez made the decision to enter the plea agreement of his own free will.

During the hearing, the transcript of the 2016 plea hearing was admitted into evidence. In addition, an affidavit from one prosecutor involved in the plea negotiations was admitted into evidence. In the affidavit, the prosecutor related that another prosecutor sent Lopez's former attorney an email setting out how Espinoza had recanted some of her prior statements to the police when she talked with a victim services counselor. The prosecutor stated that Espinoza did not ever reduce her comments to writing or submit an affidavit of non-prosecution. Further, the prosecutor stated that Espinoza made a similar recantation when talking with prosecutors later and that the recantation was memorialized in a *Brady* disclosure that was sent to McDonald on July 7, 2016, before the plea agreement was finalized and before Lopez entered his pleas on July 12, 2016. Although the prosecutor explained that the disclosure was to ensure that there was some record that the recantation had been disclosed before any plea agreement was finalized, the prosecutor also explained that the notice did not indicate that the first time the disclosure happened was on July 7, 2016, and that the prosecutor did not know when McDonald first learned of the recantation.

After considering the testimony and evidence presented at the hearing, the trial court denied Lopez's writ application. In its order, the trial court made findings of fact consistent with the testimony and other evidence summarized above and made the following relevant findings of fact and conclusions of law:

8

Findings of Fact

43. At the time of the plea, the presiding judge performed a thorough and appropriate inquiry into whether Applicant's plea was voluntary.

44. At the time of the plea, the presiding judge made an explicit finding that Applicant's plea was entered knowingly and voluntarily.

45. The record supports the finding made by the presiding judge at the time of the plea that Applicant's plea was entered voluntarily.

. . . .

50. The court finds the testimony of Eric McDonald credible.

51. The court finds the affidavit of [the prosecutor] credible.

Conclusions of Law

. . . .

66. The Court further finds that attorney Eric McDonald's investigation was reasonable, and his determination not to engage an expert was likewise reasonable under the circumstances.

67. Applicant has failed to overcome the strong presumption that his counsel's representation fell within a wide range of reasonable representation.

68. Applicant has failed to show sufficient evidence to prove the first prong of the *Strickland* standard, that counsel's actions fell below an objective standard of reasonableness.

69. Applicant has failed to show sufficient evidence to prove the second prong of the *Strickland* standard, that even if counsel had fallen below an objective standard of reasonableness, the outcome would have been different.

70. Applicant's habeas application in which he challenges the voluntariness of his plea is DENIED.

## STANDARD OF REVIEW AND GOVERNING LAW

An individual convicted of a felony or misdemeanor may seek habeas "relief from an order or judgment of conviction ordering community supervision." Tex. Code Crim. Proc. art. 11.072, § 1. When a person files a writ application, he "must be, or have been,

on community supervision, and the application must challenge the legal validity of . . . the conviction for which or order in which community supervision was imposed" or "the conditions of community supervision." *Id.* art. 11.072, § 2(b). When making its determination, the trial court "may order affidavits, depositions, interrogatories, or a hearing, and may rely on [its] personal recollection." *Id.* art. 11.072, § 6(b).

Appellate courts review a trial court's ruling on an application for writ of habeas corpus under an abuse-of-discretion standard. *Ex parte Zantos-Cuebas*, 429 S.W.3d 83, 87 (Tex. App.—Houston [1st Dist.] 2014, no pet.). "A trial court abuses its discretion when its ruling is arbitrary or unreasonable." *Gaytan v. State*, 331 S.W.3d 218, 223 (Tex. App.—Austin 2011, pet. ref'd). But a trial court does not abuse its discretion if its ruling lies within "the zone of reasonable disagreement." *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008); *see Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002). Under that standard, appellate courts review the record evidence "in the light most favorable to the trial court's ruling." *Ex parte Nelson*, 546 S.W.3d 742, 746 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

The writ of habeas corpus is an extraordinary remedy. *See Ex parte Smith*, 444 S.W.3d 661, 666 (Tex. Crim. App. 2014). To succeed, the applicant must prove, "by a preponderance of the evidence, the facts that would entitle him to relief." *Ex parte Ali*, 368 S.W.3d 827, 830 (Tex. App.—Austin 2012, pet. ref'd). In habeas corpus proceedings, "[v]irtually every fact finding involves a credibility determination," and "the fact finder is the exclusive judge of the credibility of the witnesses." *Ex parte Mowbray*, 943 S.W.2d 461, 465 (Tex. Crim. App. 1996). For habeas proceedings under article 11.072, "the trial court is the sole finder of fact," and appellate courts afford "almost total deference to a trial court's factual findings when supported by the record, especially when those findings are based upon credibility

10

and demeanor." *Ex parte Ali*, 368 S.W.3d at 830. This deferential review applies even when the findings are based on affidavits rather than live testimony. *Ex parte Thompson*, 153 S.W.3d 416, 418 n.1 (Tex. Crim. App. 2005). "When the trial court's findings of fact in a habeas corpus proceeding are supported by the record, they should be accepted" by the reviewing court. *See Ex parte Amezquita*, 223 S.W.3d 363, 367 (Tex. Crim. App. 2006).

To be entitled to post-conviction relief on the ground of ineffective assistance of counsel, "an applicant must demonstrate that (1) counsel's performance was deficient, in that it fell below an objective standard of reasonableness, and (2) the applicant was prejudiced as a result of counsel's errors, in that, but for those errors, there is a reasonable probability of a different outcome." *Ex parte Torres*, 483 S.W.3d 35, 43 (Tex. Crim. App. 2016). To establish deficient performance, the applicant must show by a preponderance of the evidence that his counsel's performance fell below the standard of prevailing professional norms. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010). Appellate review of a trial counsel's performance is "highly deferential," meaning that there is a "strong presumption" that his conduct fell within the wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. 668, 689 (1984); *see Perez*, 310 S.W.3d at 893. An ineffective-assistance claim must be "firmly founded in the record," and the record "must affirmatively demonstrate" the meritorious nature of the claim. *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

The second prong requires the applicant to establish by a preponderance of evidence that it is reasonably probable that the result of the proceeding would have been different absent his counsel's deficient performance. *Cox v. State*, 389 S.W.3d 817, 819 (Tex. Crim. App. 2012). A reasonable probability is one that is sufficient to undermine confidence in

11

the outcome. *See Nava v. State*, 415 S.W.3d 289, 308 (Tex. Crim. App. 2013); *Cox*, 389 S.W.3d at 819. For collateral challenges to a guilty plea, the focus of the prejudice inquiry is on "whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Stated differently, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*; *see Arreola v. State*, 207 S.W.3d 387, 392 (Tex. App.—Houston [1st Dist.] 2006, no pet.). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700; *see Perez*, 310 S.W.3d at 893.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The reasonableness of a decision not to investigate must be considered in light of all of the circumstances and assessed by applying a heavy amount of deference to an attorney's decision. *Ex parte Martinez*, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006). "When assessing the reasonableness of an attorney's investigation, a reviewing court must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further." *Id.* In addition, a claim "based on trial counsel's general failure to investigate" will fail in the absence of "a showing of what an investigation would have revealed that reasonably could have changed the result of the case." *Straight v. State*, 515 S.W.3d 553, 568 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). In addition, a defendant cannot claim that his trial counsel provided ineffective assistance of counsel by failing to call witnesses unless the defendant can show that the witnesses were available and that their testimony would have benefitted the defendant. *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim.

App. 1983); *Brennan v. State*, 334 S.W.3d 64, 79 (Tex. App.—Dallas 2009, no pet.); *Tutt v. State*, 940 S.W.2d 114, 121 (Tex. App.—Tyler 1996, pet. ref'd).

## DISCUSSION

In his first issue on appeal, Lopez contends that the trial court erred by denying his writ application because McDonald provided ineffective assistance. In his second issue, Lopez argues that the habeas court erred by denying his request for additional time to consult with an expert regarding McDonald's testimony.[2]

### Ineffective Assistance

In his first set of arguments in his first issue, Lopez notes that under the Performance Guidelines for Non-Capital Criminal Defense Representation and the American Bar Association Criminal Justice Standards for the Defense Function, an attorney has a duty to conduct an independent case review and investigation as promptly as possible. *See* American Bar Association Criminal Justice Standards for the Defense Function 4-4.1 ("Defense Standards"), available at https://www.americanbar.org/groups/criminal_justice/standards/ DefenseFunctionFourthEdition/ (last visited November 27, 2023); Performance Guidelines for

---

[2] We note that in the State's response to Lopez's writ application, the State asserted that his ineffectiveness claims were barred by the doctrine of laches. In its findings, the trial court mentioned that the State discussed laches in its response, but the habeas court did not conclude that Lopez's claims were barred by laches. The record does not contain evidence regarding all the elements for laches. Because the habeas court made no determination regarding laches and because we ultimately conclude that Lopez was not entitled to his requested habeas relief anyway, we will assume that the claims were not barred by the doctrine in this case in the interests of judicial economy. *See In re Steptoe*, 132 S.W.3d 434, 436 (Tex. Crim. App. 2004) (Price, J., concurring) (explaining that laches should not be addressed, in part, because trial court made no determination on issue); *see also Ex parte Bowman*, 447 S.W.3d 887, 888 (Tex. Crim. App. 2014) (noting that before laches issue can be addressed on appeal when record is insufficient to determine if it was proved, case should be remanded to trial court for hearing on laches).

13

Non–Capital Criminal Defense Representation 4.1 (State Bar of Tex. 2011) ("Performance Guidelines"), available at https://www.texasbar.com/AM/Template.cfm?Section=Texas_Bar_ Journal&Template=/CM/ContentDisplay.cfm&ContentID=14703 (last visited on November 27, 2023). After referencing the Performance Guidelines and Defense Standards, Lopez asserts that McDonald fell short of prevailing professional norms because he did not arrange for an investigator to assist him and instead chose to investigate the case himself, which according to Lopez was problematic because McDonald did not have an investigator or another third party present with him that would permit McDonald to effectively impeach the witnesses with statements made during the interview. *See* Performance Guidelines 4.1.

Moreover, Lopez characterizes McDonald's investigation as minimal and notes that McDonald's conversations with some of the witnesses were done by phone, which he contends is "an inadequate substitute for in-person lay witness interviews." Lopez contends that the failure to have in-person interviews was even more problematic regarding Espinoza because, according to Lopez, she would have been "essential" to proving the aggravated-assault and aggravated-kidnapping charges. Further, Lopez asserts that the State would not have been able to call her as a witness for the sole purpose of introducing her prior statement to the police and that had McDonald properly investigated, he would have learned that she would have testified at trial that she lied to the police because she was mad at Lopez. Additionally, Lopez highlights portions of McDonald's testimony in which he stated that he could not remember whether he reviewed J.D.'s forensic interview and insists that McDonald should have minimally reviewed that video because evidence pertaining to J.D. "would make or break the State's factual presentation at trial." Relatedly, Lopez contends that had McDonald properly investigated the case, he would have learned that J.D. likely would not have provided incriminating testimony

14

given that his statements during his forensic interview indicated that he voluntarily went with Lopez whom J.D. perceived as a father figure.

Further, Lopez emphasizes that McDonald did not hire any experts to help on the case or visit the scene of the alleged crime and admitted that in hindsight seeking assistance might have made sense in the underlying case. Lopez also argues that the State did not present any witnesses at the habeas hearing demonstrating that it could have independently proven its case irrespective of what Espinoza's testimony would have been. Moreover, although Lopez acknowledges that the police report stated that there was a neighbor who witnessed the incident, he asserts that there is nothing in the record establishing whether the neighbor would be a reliable witness. Considering the preceding, Lopez contends that the State would likely not have been able to prove that he was guilty of aggravated assault family violence or aggravated kidnapping.

In a related set of arguments, Lopez contends that his trial counsel was ineffective because he failed to communicate the difficulties that the State would have in proving the aggravated-kidnapping and aggravated-assault charges and should have relied on those difficulties during the negotiations to see if the State would consider having Lopez plead guilty to lesser-included offenses. Further, Lopez asserts that McDonald's counteroffer was not part of any reasonable strategy because nothing in the record indicates that "he ever even broached the idea of resolving the case with a plea to lesser-included offenses rather than those initially charged." Moreover, Lopez contends that if he had been properly informed of the weaknesses of the State's case, he either would not have agreed to plead guilty to the charged offenses or would have directed McDonald to continue negotiating. As support for these claims, Lopez again points to the Performance Guidelines, which specify that trial attorneys should not recommend

15

accepting a plea without an appropriate investigation of the evidence and governing case law, that one benefit from a plea agreement is dismissal or reduction in one or more of the charged offenses, and that trial attorneys should keep their clients fully informed of any ongoing negotiations and explain all the consequences of entering a plea agreement or proceeding to trial. *See* Performance Guidelines 6.1, .2.

As an initial matter, we note that best practices reflected in bar association standards are guides to determine what is reasonable, not "inexorable commands." *Padilla v. Kentucky*, 559 U.S. 356, 366-67 (2010); *see In re McCann*, 422 S.W.3d 701, 707 (Tex. Crim. App. 2013) (explaining that "guidelines are only persuasive authority"). In other words, the guidelines are "aspirational" and do not establish a minimum code of conduct that must be met to avoid being ineffective; rather, to be deemed ineffective, an attorney's conduct must be "so outrageous that no competent counsel would have engaged in it." *See Thomas v. State*, 365 S.W.3d 537, 543, 544 (Tex. App.—Beaumont 2012, pet. ref'd). Moreover, the language of the Defense Standards and Performance Guidelines relied on by Lopez indicate that an attorney may perform the investigation and does not mandate that an attorney hire an investigator or an expert. Defense Standards 4-4.1; Performance Guidelines 4.1. Regarding the need for expert and investigative assistance, they simply instruct the attorney to consider whether those types of assistance are appropriate or would be helpful. Defense Standards 4-4.1; Performance Guidelines 4.1.

In this case, although McDonald agreed in hindsight that hiring an investigator or expert might have been a good idea, he also testified that hiring an investigator or expert witness was not necessary in this case and would not have made a difference in the ultimate outcome, and the habeas court found McDonald's testimony credible. *See Ex parte Jimenez*,

364 S.W.3d 866, 883 (Tex. Crim. App. 2012) (explaining that effectiveness claims are evaluated from viewpoint of counsel "at the time he acted and not through 20/20 hindsight"). Although Lopez contends that the interviews of witnesses should have been in person and in the presence of an investigator, he does not refer to any binding case law determining that the failure to conduct interviews in the manner he suggests constitutes ineffective assistance. At the writ hearing and in his writ application, Lopez did not identify an expert who could have testified at a trial or what beneficial testimony the expert could have provided and similarly failed to set out what beneficial testimony a third party or investigator could have provided regarding statements by the witnesses. *See Brennan*, 334 S.W.3d at 79; *see also Brown v. State*, No. 03-16-00011-CR, 2017 WL 876029, at \*6 (Tex. App.—Austin Feb. 28, 2017, pet. ref'd) (mem. op., not designated for publication) (explaining that "a defendant cannot claim that his trial counsel provided ineffective assistance of counsel by failing to call witnesses unless the defendant can show that the witnesses were available and that their testimony would have benefitted the defendant").

Moreover, McDonald's decision not to hire an expert or investigator was formed based on his own investigation in the case, including meeting with and talking with Lopez multiple times and talking with Espinoza and other witnesses and reviewing all the discovery in the case through Travis County's open file discovery program before Lopez agreed to enter guilty pleas, including the summary of witness statements describing the offense and the summary of the evidence discovered by the police. During his investigation, McDonald learned that Espinoza had recanted many of the claims and used that information when negotiating with the State to achieve the goal of avoiding a felony conviction and prison time and allowing Lopez to retain his commercial driver's license. *See Ex parte Overton*, 444 S.W.3d 632, 640 (Tex. Crim. App. 2014) (explaining that "strategic choices made after thorough investigation of

17

law and facts relevant to plausible options are virtually unchallengeable" (quoting *Strickland*, 466 U.S. at 690)).

McDonald also testified that the State initially insisted that Lopez be required to serve at least five years in prison under any plea-agreement before McDonald came up with a creative counteroffer that Lopez was pleased by. Further, McDonald related that Lopez indicated that he would not commit any additional crimes if he were placed on community supervision and that the presentence investigation report indicated that Lopez had a reduced risk of recidivism. Additionally, McDonald explained that the State was not receptive to further negotiations and would not accept a more favorable counteroffer than McDonald's. McDonald described his counteroffer as the best deal that the State would consider. Had Lopez not entered into a plea agreement in which he was placed on deferred-adjudication community supervision, he faced the potential of being convicted and sentenced from five years' to life imprisonment for the aggravated-kidnapping charge, two to twenty years' imprisonment for the aggravated-assault charge, two to ten years' imprisonment for the evading-arrest charge, and six months to two years in jail for the endangering charge. *See* Tex. Penal Code §§ 12.32-.35, 20.04, 22.02, .041, 38.04.

Further, McDonald testified that he had been a criminal lawyer for 25 years; that in his experience a recantation would not require the State to drop the charges; that family-violence cases in which there are recantations can still result in convictions; that Lopez inculpated himself; that witnesses other than Espinoza, including the police, could have testified about the incident; and that the evidence in this case was significant and established the elements of the charged offenses. *See Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994) (explaining that jury could reject any or all evidence offered by State or defendant); *Scugoza v.*

18

*State*, 949 S.W.2d 360, 363 (Tex. App.—San Antonio 1997, no writ) (overruling challenge to propriety of expert's testimony discussing how commonplace recantations are in family-violence cases).

Although Lopez faults the State for not calling the neighbor as a witness to relate what he would have testified to at trial, Lopez had the burden of establishing his ineffective assistance claim by a preponderance of the evidence. *Ex parte Ali*, 368 S.W.3d at 830. Further, investigating officers noted that the neighbor did witness the incident, which is why he told Espinoza to wait in his house, and noticed that Lopez had a gun on him when he left the property with J.D. Similarly, Lopez did not call J.D. as a witness at the habeas hearing to testify about the incident, and it is therefore unclear what the specifics of his testimony would have been. Even though McDonald explained that due to the passage of time he could not remember for certain if he had watched the forensic interview of J.D., he believed that he had and stated that he had reviewed the interview summary documenting statements by J.D. that incriminated Lopez. Additionally, McDonald recalled that he was able to get the relevant mitigating evidence from his discussions with Lopez and from his review of the presentence investigation report, and Lopez has not identified what additional mitigating evidence a further investigation would have revealed. *See Young v. State*, 591 S.W.3d 579, 606 (Tex. App.—Austin 2019, pet. ref'd) (stating that "a claim 'based on trial counsel's general failure to investigate' will fail in the absence of 'a showing of what an investigation would have revealed that reasonably could have changed the result of the case'" (quoting *Straight*, 515 S.W.3d at 568)).

Further, the affidavit for Lopez's arrest alleged that investigating officers looked for J.D. for several hours before ultimately pursuing Lopez in his car after he sped away and reached speeds over 100 miles per hour while J.D. was inside. The officers also observed Lopez

19

wreck the car and documented injuries to J.D. that he sustained in the crash. The officers found shell casings in the area where Espinoza said Lopez shot at her feet, and the officers found matching ammunition inside Lopez's car. While interacting with Espinoza, the officers noticed injuries to her legs and abdomen and reviewed text messages from Lopez's phone to Espinoza's phone in which the sender threatened to kill J.D. and her. *See Ex parte Torres*, No. 03-14-00169-CR, 2015 WL 2066232, at *6 n.1 (Tex. App.—Austin Apr. 29, 2015, no pet.) (mem. op., not designated for publication) (observing that habeas courts evaluating claim that applicant would have insisted on trial may consider "evidence concerning the likelihood of success at trial"); *see also Longoria v. State*, 154 S.W.3d 747, 758 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (noting that "[t]here is a natural and permissible assumption that calls from a person's cellular telephone were made by that person").

When discussing his recommendation that Lopez enter into a plea agreement, McDonald testified that he regularly talked with Lopez and that he talked with Lopez about Espinoza's recantation and how it could affect the case. Relatedly, McDonald explained that he went over the terms of the plea with Lopez, advised Lopez of his right to trial, and told Lopez that the plea decision was his to make, and McDonald related that Lopez chose to enter into the plea agreement freely and voluntarily. The record from the plea hearing shows that Lopez was properly admonished as to the consequences of his pleas, *see Soto v. State*, 837 S.W.2d 401, 405 (Tex. App.—Dallas 1992, no writ) (explaining that if record shows that defendant was properly admonished about consequences of guilty plea, that is prima facie showing that defendant knowingly and voluntarily entered plea), went over with McDonald the plea documents stating that he was freely and voluntarily entering his pleas, and informed the trial court that he understood the rights that he was waiving as well as the terms of the plea agreement and

20

potential punishment ranges for the offenses. Finally, McDonald described his strategy as a reasonable one based on all the information learned during his investigation.

On this record and given our standard of review, we conclude that Lopez failed to meet his burden of establishing that McDonald's representation fell below the standard of prevailing professional norms. *Cf. Ex parte Simpson*, 260 S.W.3d 172, 173, 179 (Tex. App.— Texarkana 2008, pet. ref'd) (determining that habeas court did not abuse its discretion by concluding that trial counsel was not ineffective where accepting plea offer allowed defendant to "avoid any criminal conviction" and avoid prison during pendency of appeal by being placed on deferred-adjudication community supervision, where defendant wanted to avoid prison, where trial counsel relied on his extensive experience to evaluate case, and where trial counsel concluded that best option to keep defendant out of "prison was to accept that negotiated plea agreement").

Having concluded that Lopez did not satisfy his burden to prove the first *Strickland* prong, we need not address his remaining set of arguments in this issue asserting that McDonald's performance prejudiced him. *See Strickland*, 466 U.S. at 697. Accordingly, we conclude that the habeas court did not abuse its discretion by denying Lopez's application for writ of habeas corpus and, therefore, overrule his first issue on appeal.

**Denial of Request for Continuance**

In his second issue on appeal, Lopez contends that the habeas court erred by denying his request for additional time to consult with an expert. Specifically, Lopez highlights that before the habeas court made its ruling at the hearing, he requested that he be given the opportunity to have an expert examine McDonald's testimony from the habeas hearing to

21

analyze what a reasonable attorney would have done under the circumstances as described by McDonald. Specifically, Lopez referenced the recantation by Espinoza, which Lopez's habeas attorney asserted he had never heard about before the hearing. The trial court denied the request and explained that Lopez had plenty of time to consult with an expert if he wanted because the writ application had been filed more than a month earlier.

On appeal, Lopez contends that the habeas court erred because the request was based on the recantation that had not been disclosed to the defense previously. Although Lopez acknowledges that he made no written request for a continuance, *see* Tex. Code Crim. Proc. art. 29.03, he asserts that his request was made during the hearing and was more comparable to a request for a brief pause in the proceeding to accommodate witness scheduling than a continuance for the entire matter to a distant date or time. Further, he argues that the trial court's ruling prohibited him from calling "an expert witness to testify about the reasonableness of Mr. McDonald's actions while representing Mr. Lopez." Lopez contends that experts may testify about prevailing professional norms to assist trial courts in deciding whether a trial attorney's representation was ineffective and that this type of evidence would have helped the habeas court evaluate the reasonableness of McDonald's plea-negotiation tactics.

Assuming for the sake of argument that Lopez's request was as suggested a request for a continuance, appellate courts review a ruling denying a motion for continuance for an abuse of discretion. *See Vasquez v. State*, 67 S.W.3d 229, 240 (Tex. Crim. App. 2002). Under that standard, a trial court's ruling will only be reversed if it is arbitrary or unreasonable. *Gaytan*, 331 S.W.3d at 223. Further, to establish an abuse of discretion for this type of ruling, "the defendant must show that he was actually prejudiced by the denial of his motion." *Vasquez*, 67 S.W.3d at 240. In other words, a "defendant must show 'specific prejudice to his defense' to

22

establish that the trial court abused its discretion in refusing to grant a continuance." *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006) (quoting *Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex. Crim. App. 1995)); *see also Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001) (explaining that "[a] trial judge has broad discretion in maintaining control and expediting the trial").

As an initial matter, we note that it is not entirely clear what additional information Lopez believed had been disclosed during the hearing that prompted the request for a continuance. During the hearing, Lopez explained the need for the expert witness by saying that he "didn't know about the recantation that he talked about. [McDonald] just told me about that today." However, in Lopez's motion to stay adjudication that he filed a month before the habeas hearing, he stated that he had learned about Espinoza's recanting her statement to the police after the State provided him with a copy of an email sent to Lopez's first trial attorney setting out Espinoza's statements to a victim services counselor. Accordingly, that information had already been disclosed by the time of the habeas hearing.

In any event, Lopez called McDonald to the stand to discuss his representation, and the habeas court could have reasonably concluded that Lopez would have anticipated before the hearing the need for having an expert witness to evaluate whether Lopez's representation fell below the standards of prevailing professional norms. Further, although Lopez generally contends that the habeas court could have benefitted from an expert's testimony, he does not specify what the expert would have testified to or how the testimony would have benefitted his ineffectiveness claim. *See Renteria*, 206 S.W.3d at 702 (explaining that case law "requires more than . . . speculation to justify an appellate reversal of a case for a trial court's failure to grant a

23

continuance"). Additionally, Lopez effectively questioned McDonald regarding his knowledge of the recantation and regarding whether McDonald provided effective assistance.

On this record, we are unable to conclude that the habeas court abused its discretion by denying Lopez's request for a continuance and, therefore, overrule his second issue on appeal. *See Heiselbetz*, 906 S.W.2d at 512.

## CONCLUSION

Having overruled Lopez's issues on appeal, we affirm the habeas court's order denying his application for writ of habeas corpus.

_____

Thomas J. Baker, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed: November 30, 2023

Do Not Publish